**UNITED STATES of America, Appellee,**

v.

**Fred M. GLOVER, Appellant.**

**No. 96–3130.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 4, 1997.

Decided Sept. 4, 1998.

Antoini M. Jones argued the cause for appellant, with whom Joseph L. Gibson, Jr. was on the brief.

Helen M. Bollwerk, Assistant U.S. Attorney, argued the cause for appellee, with whom Mary Lou Leary, U.S. Attorney, John R. Fisher, Thomas C. Black, and Richard L. Edwards, Assistant U.S. Attorneys, were on the brief.

Before: SILBERMAN, WILLIAMS and GARLAND, Circuit Judges.

GARLAND, Circuit Judge:

Defendant Fred Glover was convicted and sentenced on multiple charges of distributing crack cocaine, and of doing so within 1000 feet of a school. Glover claimed at trial that he was merely "play-acting" when he sold crack to a government informant. But he also argued in the alternative that, even if he were guilty of distributing crack, he was "entrapped" by the government into committing the crime. His principal claim on appeal is that the district court erred by failing to give the jury an instruction on his entrapment defense. Glover also contends that: there was insufficient evidence for a jury to conclude he distributed drugs within 1000 feet of a school; he was the victim of sentencing entrapment because the government informant caused the drug transactions to occur within 1000 feet of a school; his sentencing pursuant to a statute that classified his prior offenses as felonies violated the Ex Post Facto Clause of the Constitution; and his counsel provided ineffective assistance at trial. For the reasons set forth below, we reject each of these contentions and affirm the judgment of the district court.[1]

**I**

In August 1995, Glover was operating a restaurant on Ninth Street, N.W. in Washington, D.C. Stepney Jones came to see Glover at the restaurant. Jones and Glover had played basketball together in the neighborhood in the early 1970s, but they did not know each other well and had not seen each other in years. Glover knew that Jones operated a convenience store in northwest Washington, called "the Corner Store." What Glover did not know was that Jones was working as an informant for the Metropolitan Police Department (MPD) and the Drug Enforcement Agency (DEA).

Claiming that he had recently won some money in the lottery, Jones asked Glover whether he could "get a buy off him." Trial Transcript ("Tr.") at 189. Glover told Jones

---

1. Glover raises a number of additional contentions as well. We have considered each of them, but reject them as too meritless for further discussion.

to "get back with him" and gave Jones his pager number and an identification code to use when paging him. *Id.* at 189, 200. Jones tried paging Glover with the code several times, but Glover did not initially return the pages.

On August 22, 1995, Jones succeeded in reaching Glover, and asked whether he could purchase cocaine from him. In another phone call later that day, Glover asked whether Jones wanted it "hard or soft," referring to the distinction between crack and powder cocaine. Glover stopped by Jones' convenience store later that day to confirm what Jones wanted. The following day, August 23, Glover telephoned Jones and then came to his store. In the store's basement, in a transaction recorded on videotape, Glover gave Jones 27.68 grams of crack in exchange for $800 provided to Jones by the DEA.

On September 12, 1995, Jones again telephoned Glover and requested drugs. Later that afternoon, Glover came to the store, went to the basement, and sold Jones 58.66 grams of crack for $1600. The DEA again provided the money Jones used and videotaped the transaction.

Finally, on December 20, 1995, Jones had additional telephone conversations with Glover in which he said he wanted to purchase more crack. On December 21, 1995, Glover arrived at Jones' store, gave Jones 58.15 grams of crack at the top of the stairs leading to the basement, and received $1500 in DEA funds when they reached the basement. *Id.* at 237–40. The portion of the transaction that occurred in the basement was again videotaped. Upon leaving Jones' store, the police arrested Glover and seized the DEA money from him.

At trial, Glover conceded that he had participated in each of the videotaped transactions, but testified that he had done so only as a form of "play-acting." Glover said Jones told him he needed money and that he had a "cousin in Detroit" he wanted to impress with his involvement in the drug trade. *Id.* at 365–66. Glover testified that he agreed to participate in what he believed to be sham drug transactions in order to "impress" Jones' cousin from Detroit. He said Jones always gave him the substance to be

exchanged in advance, but outside of the video camera's range. Glover said he did not know what the substance was, but that on one occasion Jones told him it was soap. Glover also said that he always returned the money to Jones after leaving the basement—with the exception of the final transaction, when the money was found on his person. Glover said he did not know the transactions were being videotaped, but said he believed Jones' cousin was watching them through a crack in the basement wall.

In addition to asserting the "play-acting" defense, Glover also requested that the district court give the jury an entrapment instruction, arguing that he was entitled to such an instruction based on his testimony that Jones induced him to participate in the charged conduct. The trial judge denied the request, relying at first on the ground that Glover had not acknowledged that he committed the crime. *Id.* at 454. Later, after reviewing this court's decision in *United States v. McKinley,* 70 F.3d 1307 (D.C.Cir. 1995), the judge rested his denial on the ground that "the factual predicate that would trigger the requirement that such an instruction be given is not present in this case." Tr. at 457. The jury subsequently convicted Glover on all charges and this appeal followed.

## II

■ We review the district court's decision to deny Glover's request for an entrapment instruction de novo. *United States v. Layeni,* 90 F.3d 514, 517 (D.C.Cir.1996). In so doing, we must take Glover's "version of the facts as true." *McKinley,* 70 F.3d at 1310; *see United States v. Borum,* 584 F.2d 424, 427 (D.C.Cir.1978). But which version? That he was play-acting? That he never kept any money (except the money the government found on him) and never intended to distribute drugs? Or that he did keep the money and did intend to distribute drugs, but that that intent was formed as the result of government inducement?

In its first decision, the district court essentially assumed the truth of the play-acting version to which Glover testified. It therefore concluded that since Glover said he had not intended to distribute drugs, he could not

have been wrongfully induced by the government into so doing. That was a reasonable conclusion. Indeed, it could be said that to have taken the other view would have permitted Glover's attorney to argue to the jury as follows: Even if you believe my client lied to you on the stand when he said he was play-acting, you should still find him not guilty if the government wrongfully induced his drug dealing. And "there is respectable authority for concluding that no legitimate end of the criminal justice system is served by requiring a trial court to entertain such tactics, in the form of an entrapment defense which is at odds with the defendant's own testimony." *Mathews v. United States*, 485 U.S. 58, 71, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988) (White, J., dissenting).

Respectable as such authority is, however, it was the dissenting rather than majority view in *Mathews v. United States*. In that case, the Supreme Court began with the premise that defendants are permitted to raise inconsistent defenses, even, the Court said, as inconsistent as arguing in a rape case "that the act did not take place and that the victim consented." *Id.* at 64, 108 S.Ct. 883 (citing *Johnson v. United States*, 426 F.2d 651, 656 (D.C.Cir.1970)). It then concluded that, since inconsistent defenses are permitted, and since "a defendant is entitled to an instruction as to any recognized defense for which there exists" sufficient evidence, 485 U.S. at 63, 108 S.Ct. 883, it followed that "even if the defendant denies one or more elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment," *id.* at 62, 108 S.Ct. 883.

■ It could be said that the defendant did not really present inconsistent positions in *Mathews*. There, the defendant was a Small Business Administration employee who accepted loans from a government contractor who, unbeknownst to him, was cooperating with law enforcement. The government charged that the loans were a gratuity in exchange for an official act. Mathews contended they were personal loans unrelated to any official action. He also contended that

the cooperator induced him to accept the loans. If that were all Mathews had argued, the two contentions would not necessarily have constituted inconsistent defenses. Rather, they could be regarded as two elements of a single defense of lack of criminal intent: He did not accept the loans *in exchange for* an official act; instead, the government had tricked him into accepting loans that he thought were unrelated to his work.[2] The same would be true here if Glover had argued only that the government had tricked him into distributing what he thought was soap.

But that was not all that either Mathews or Glover contended. Mathews wanted both to testify that he had no intent to commit a crime, and to have the jury instructed that *even if* he did have such an intent (i.e., to take the loan in exchange for an official act), it should still find him not guilty if it found the government had entrapped him. *Id.* at 65, 108 S.Ct. 883. Similarly, Glover wanted an instruction that even if the jury found he did intend to distribute crack (rather than soap), it should still acquit if it found the government had wrongfully induced him. Assuming there were sufficient evidence of entrapment, the Supreme Court held that Mathews was entitled to such an instruction. The same must be true for Glover.

Moreover, the necessary corollary of *Mathews* is that the version of the facts we must take as true for purposes of analyzing the validity of Glover's entrapment defense is the one that supports that defense ("I did it, but I was entrapped"), and not his alternative claim of innocence ("I did it, but I was play-acting."). That means, for example, that we must assume Glover kept the money he was seen to take on the videotape, and that he knew the substance he gave Jones was crack rather than soap. Otherwise, there would be no evidence of inducement, and no crime into which the defendant had been induced. And that would effectively deprive the defendant of his right, under *Mathews*, to assert inconsistent defenses.

2. Mathews testified that the contractor told him that he (the contractor) was hiding the money from his wife, and needed to get rid of it quickly by loaning it to Mathews. *See Mathews*, 485 U.S. at 61, 108 S.Ct. 883.

■ The government does not dispute these conclusions drawn from *Mathews,* and does not support the district court's denial of an entrapment instruction on the ground that Glover refused to concede his intent. *See* Gov't Br. at 15 n.16. Instead, the government argues that Glover has not established that "there is sufficient evidence from which a reasonable jury could find entrapment." *Mathews,* 108 S.Ct. at 886. And it interprets the trial court as ultimately relying on that ground in refusing to give an entrapment instruction—i.e., on the ground that "the factual predicate that would trigger the requirement that such an instruction be given is not present in this case." Tr. at 457. We interpret the district court's refusal the same way, and agree with both the district court and the government that Glover did not establish the prerequisites for an entrapment instruction.

■ The entrapment defense "has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews,* 485 U.S. at 63, 108 S.Ct. 883. In this circuit, the defendant bears the initial burden of showing government inducement; if he is successful, the burden then shifts to the government to prove the defendant was predisposed to commit the crime. *See McKinley,* 70 F.3d at 1312; *United States v. Budd,* 23 F.3d 442, 445 (D.C.Cir.1994); *United States v. Whoie,* 925 F.2d 1481, 1484 (D.C.Cir.1991). Both inducement and predisposition are normally matters for the jury. *See McKinley,* 70 F.3d at 1312; *Budd,* 23 F.3d at 445; *Whoie,* 925 F.2d at 1483. "However, a defendant only 'is entitled to an entrapment instruction when[ ] there is sufficient evidence from which a reasonable jury could find entrapment.'" *McKinley,* 70 F.3d at 1309 (quoting *Mathews,* 485 U.S. at 62, 108 S.Ct. 883); *see United States v. Burkley,* 591 F.2d 903, 914 (D.C.Cir.1978).

■ The government's behavior amounts to inducement when it was "such that a law-abiding citizen's will to obey the law could

have been overborne." *United States v. Kelly,* 748 F.2d 691, 698 (D.C.Cir.1984); *see McKinley,* 70 F.3d at 1313. Glover argues that he satisfied the inducement predicate because Jones repeatedly asked him to provide drugs.[3] We have held, however, that even repeated government solicitations do not establish inducement "unless the requests are coupled with persuasive overtures, or unless there is evidence of reluctance on the defendant's part demonstrating that the repetition of the requests may have moved an otherwise unwilling person to commit a criminal act." *McKinley,* 70 F.3d at 1312 (internal quotations and citations omitted).

Taking the second caveat first, Glover's best evidence of "reluctance" is his testimony that he initially avoided Jones' pages because he did not want to provide him with narcotics. Glover only responded, he claims, when Jones entered a phony code into the pager. But even accepting this testimony, it is insufficient evidence of reluctance. As soon as Jones did reach him, Glover made clear he was willing to deal. That same day, Glover called Jones back to confirm whether he wanted it "hard or soft," and the very next day Glover delivered the crack to Jones' store—on videotape. This ready willingness to supply drugs once Jones contacted him belies Glover's claim that his will was overborne by incessant government overtures. To the contrary, it suggests the kind of "acquiesce[nce] with reasonable readiness" we found insufficient to show inducement in *McKinley,* 70 F.3d at 1312.

Nor is there evidence of any "persuasive overtures" that go beyond those ordinarily present in a drug transaction. Even if we disregard Glover's testimony that he never took any money from Jones—as *Mathews* indicates we must—such payments are "the typical benefit of participating in this type of criminal enterprise." And that is a "form of reward that is not sufficient, by itself, to establish inducement." *Id.* at 1314; *see United States v. Evans,* 924 F.2d 714, 717 (7th Cir.1991).

---

3. Because we are concerned here with the evidence that supports Glover's entrapment claim—i.e., that the government induced him to form the intent to distribute crack—we consider only the alleged inducement to engage in a drug transac- tion. As suggested above, inducement to "play act" alone would not justify an entrapment instruction, although it would be relevant to defendant's alternative defense that he never intended to do anything more than play-act.

Glover also claims that at one point Jones tried to further induce him by offering to trade Glover's crack for heroin from Jones' "cousin" at an unusually advantageous rate. Glover Br. at 32. Even if such a trade went well beyond the "typical benefit" for this type of conduct, Glover's own testimony was that this offer was not made until the first two crack transactions had already been completed. Tr. at 374–75. Hence, it could not have been an inducement for those transactions. *See McKinley,* 70 F.3d at 1313–14. Nor did Glover testify that he would not have completed the remaining crack deal were it not for the heroin offer. *See id.* at 1313. Indeed, since Glover testified that he declined the heroin offer, and since no evidence was offered to the contrary, it does not appear to have amounted to much of an inducement for anything.

Finally, Glover contends that Jones played off his "friendship" in order to convince him to provide the drugs in question. But even Glover concedes the evidence shows he had not seen Jones in years, did not know him well, and that "they were not close friends." Glover Br. at 3, 17; Tr. at 357, 360. An appeal to that kind of friendship is hardly sufficient to overbear the will of a law-abiding citizen. If it were, the government would never be able to use an informant who had virtually any kind of preexisting relationship with a defendant.

In short, Glover produced no evidence of inducement beyond the ordinary opportunity to commit a crime and profit thereby. That kind of evidence does not warrant an entrapment instruction, and the district court properly refused to give one.

## III

■ Glover also argues that there was insufficient evidence for the jury to conclude he distributed cocaine within 1000 feet of a school, in violation of 21 U.S.C. § 860(a), commonly known as the "schoolyard statute." While sufficiency of the evidence claims are reviewed de novo, our role is still limited.

We must "allow[ ] the government the benefit of all reasonable inferences that may be drawn from the evidence, and permit[ ] the jury to determine the weight and credibility of the evidence." *United States v. Sutton,* 801 F.2d 1346, 1358 (D.C.Cir.1986). And we must affirm the conviction if any reasonable juror could have found the elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ At trial, the government offered uncontested testimony that the distance between Jones' store—where each of the three drug transactions took place—and Banneker High School was 674 feet. Tr. 315–16. Glover asserts this testimony was insufficient for two reasons. First, he claims that the jury could not properly infer that Banneker High School "was in fact in existence at the time of the alleged transactions" or that it was "in fact at the same location at the time of the alleged transactions." Glover Br. at 36. We disagree. Banneker High School is a well-known institution in the District of Columbia. A police officer testified that he had been to the school and had measured the distance between the school and the convenience store. A diagram indicating the location of "Banneker Senior High School" and Jones' store was introduced into evidence. Glover did not suggest, by cross-examination or otherwise, that Banneker was not in existence or at the same location at the relevant time.[4] Under these circumstances, the jury could reasonably infer that the unstated premise of the testimony and diagram was that both were accurate as of the dates at issue, and that Banneker High School had not been built in the nine months between the first drug transaction and defendant's trial. *See United States v. Brookins,* 919 F.2d 281, 283–84 (5th Cir.1990).[5]

Second, Glover claims that the 674–foot measurement the government offered at trial was insufficient to establish that the drug transactions took place within 1000 feet of a

---

4. And for good reason: even defendant's appellate counsel concedes he "is of the belief that Banneker Senior High School has been in the same location for over forty-five years." Glover Br. at 37 n.3.

5. For the same reason, we reject Glover's contention that, without express testimony, the jury could not infer that the "calibrated measuring wheel" used to measure the 674–foot distance was "in working order."

school, because it measured only the distance between the school and the front door of the store, and did not include the distance from the front door to the basement where the drug transactions actually took place. In support, Glover cites *United States v. Applewhite*, 72 F.3d 140 (D.C.Cir.1995), and *United States v. Johnson*, 46 F.3d 1166 (D.C.Cir. 1995), cases in which we held that measurements to points short of the actual locations of the drug transactions were insufficient to sustain convictions under the schoolyard statute.

*Applewhite* and *Johnson* do not carry the day for Glover. In each of those cases, the distance from the school to the property line of the location at which the drug deal took place was itself well over 900 feet. *See Applewhite*, 72 F.3d at 143–44 (distance from school to entrance of multi-unit apartment building was 920.2 feet); *Johnson*, 46 F.3d at 1169–70 (distance from school "to a point five feet up the walkway to Johnson's house" was 994 feet). In those cases, we concluded that the jury could not reasonably infer that if the remaining, unmeasured distance were added, the total would still be less than 1000 feet. The leeway for error was simply too small.

In this case, by contrast, after taking account of the distance between the school and the store's front door, the government still had 326 feet to spare. Hence, unless the distance between the convenience store's front door and its basement was more than the length of a football field, the drug transactions took place within the prohibited 1000 feet. A reasonable juror, using ordinary common sense, could conclude that a convenience store in a residential neighborhood is extremely unlikely to be larger than a football field. *See United States v. Harrison*, 103 F.3d 986, 990 (D.C.Cir.1997) (where distance from school to building entrance was 472 feet, jury could reasonably conclude that additional distance to apartment did not exceed 528 feet); *United States v. Baylor*, 97 F.3d 542, 546–47 (D.C.Cir.1996) (where distance from school to building was 534 feet, jury could reasonably conclude additional distance to basement apartment did not exceed 466 feet). Indeed, common sense was not all the jurors had to rely on here. During the trial, the jury saw several videotapes showing both the inside and outside of Jones' store,

and also had the benefit of a diagram of the neighborhood that could be used to roughly compare the size of the entire store to the distance between the store and the school. *See* Gov't Appendix (Vol.I) at 18.

## IV

Glover next contends that he was the victim of "sentencing entrapment." He charges that his concurrent sentences under the schoolyard statute should be vacated because the government "orchestrated" the crimes to occur within 1000 feet of a school, by luring him to Jones' store to make the drug transactions. Because defendant did not raise this claim below, we review it solely for plain error. *See* Fed R.Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731–32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

First, we see no evidence of "orchestration" here. As Glover himself testified, he "often went to Jones' store to play numbers [the lottery]," Glover Br. at 17, referring specifically to the period during which Jones asked him for drugs. That alone made the store a logical location for the drug deal. Nor does the government appear to have had much motive to lure Glover to the store to take advantage of enhanced sentences for distributing within 1000 feet of a school. Glover's recidivist history generated substantially longer sentences than did the schoolyard provision. *See* Part V below.

[13] But even if the government had chosen Jones' store to increase Glover's sentencing exposure, that alone would not constitute sentencing entrapment. The usual elements of the entrapment defense—inducement and lack of predisposition—would still have to be shown. As we have held before, even where government agents insist that cocaine be delivered in the form of crack rather than powder to ensure a stiffer penalty, that does not constitute sentencing entrapment where the defendants "showed no hesitation in committing the crimes for which they were convicted." *See United States v. Shepherd*, 102 F.3d 558, 566–67 (D.C.Cir.1996) (quoting *United States v. Walls*, 70 F.3d 1323, 1328–30 (D.C.Cir.1995)). There is no reason for the rule to be any different where the issue is

the location of the transaction rather than the kind of drug distributed. In this case, Glover readily agreed to the drug transaction, and showed no hesitation about conducting it in Jones' store. That, alone, is "enough to destroy [his] entrapment argument." *Walls,* 70 F.3d at 1329.

## V

 Glover also argues that the enhancement of his sentences, based on prior convictions in Maryland and the District of Columbia for heroin possession, violated the Ex Post Facto Clause of the Constitution, art. I, § 9, cl. 3. Glover contends that a 1994 statute impermissibly and retroactively "reclassified" these prior misdemeanors as felonies. We review this legal claim de novo. *See United States v. Williams–Davis,* 90 F.3d 490, 511 (D.C.Cir.1996).

 At the time Glover committed the heroin offenses, Maryland and the District of Columbia considered them misdemeanors, even though each carried with it the possibility of imprisonment for more than one year because of Glover's prior criminal history. Moreover, until 1994, they also would have been considered misdemeanors for the purpose of enhancing a federal sentence. *See* 21 U.S.C. § 841(b)(1)(A) (1988) (defining "felony drug offense" as an offense "that is a felony under any law of a State ... that prohibits or restricts conduct relating to narcotic drugs...."). But on September 13, 1994, Congress changed the law to define the term "felony drug offense" as "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State ... that prohibits or restricts conduct relating to narcotic drugs...." Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, tit. IX, § 90105, 108 Stat. 1987–88, 2151 (codified at 21 U.S.C. § 802(44)).

Title 21 of the U.S.Code establishes different sentences for distributing different amounts of crack cocaine, and provides for enhanced sentences if the distribution occurs "after prior conviction[s] for felony drug offense[s]." 21 U.S.C. § 841(b)(1)(A) & (B). If his prior heroin convictions had not been considered felony drug offenses, Glover would have faced statutory terms of five to forty years imprisonment for the August 23,

1995 sale of five grams or more of crack, and ten years to life for each of the subsequent sales of fifty grams or more. *See* 21 U.S.C. § 841(b)(1)(B)(iii) & (A)(iii); *see also* Gov't Br. at 32 n.32. Because the prior convictions were considered "felony drug offenses" under the statute, however, he faced terms of ten years to life for the five-gram charge and mandatory life imprisonment for distributing fifty grams or more. *See* 21 U.S.C. § 841(b)(1)(B)(iii) & (A)(iii).

 The aspect of the Ex Post Facto Clause with the most relevance to Glover's claim is that which bars the government from retroactively "increas[ing] the punishment for criminal acts." *California Dep't of Corrections v. Morales,* 514 U.S. 499, 504, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995) (internal quotations and citation omitted); *Collins v. Youngblood,* 497 U.S. 37, 42–43, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). It is well-settled, however, that a sentencing enhancement based on past offenses is not an "additional penalty for the earlier crimes," but rather "a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one." *Gryger v. Burke,* 334 U.S. 728, 732, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948); *see also Nichols v. United States,* 511 U.S. 738, 747, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994) ("Enhancement statutes, whether in the nature of criminal history provisions ... or recidivist statutes ... do not change the penalty imposed for the earlier conviction."). For this reason, the circuits uniformly have rejected similar Ex Post Facto attacks on other repeat offender statutes. *See United States v. Cabrera–Sosa,* 81 F.3d 998, 1001–02 (10th Cir.1996); *United States v. Farmer,* 73 F.3d 836, 841 (8th Cir.1996); *United States v. Presley,* 52 F.3d 64, 68 (4th Cir.1995); *United States v. McCalla,* 38 F.3d 675, 680 (3d Cir.1994); *United States v. Saenz–Forero,* 27 F.3d 1016, 1019–21 (5th Cir.1994); *United States v. Arzate–Nunez,* 18 F.3d 730, 733–35 (9th Cir.1994); *United States v. Forbes,* 16 F.3d 1294, 1301–02 (1st Cir.1994); *Covington v. Sullivan,* 823 F.2d 37, 39–40 (2d Cir.1987).

 Despite Glover's characterization, the 1994 "reclassification" of his prior crimes did not add a new penalty for those crimes

themselves. Like other repeat offender statutes, it did nothing more than prospectively define new, more drastic consequences if Glover committed a further crime in violation of § 841(b). Because the provision expanding the category of prior offenses that would prospectively be considered "felony drug offenses" was passed in 1994, a year before the first drug transaction at issue here, Glover had "fair warning," *see Miller v. Florida,* 482 U.S. 423, 430, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), that he would face stiffer penalties as a repeat offender if he committed another drug-related offense. Those penalties were punishments for his 1995 crimes, not for his prior crimes, and therefore do not violate the Ex Post Facto Clause even though the federal statute labeled the prior convictions differently than did the states. *See Arzate–Nunez,* 18 F.3d at 733.[6]

## VI

 Finally, Glover argues that he was denied effective assistance of counsel at trial. Where, as here, the defendant has not sought to develop a factual record of ineffectiveness in the district court, our normal practice is to remand for an evidentiary hearing. *See United States v. Toms,* 136 F.3d 176, 181 (D.C.Cir.1998). However, we have recognized two exceptions to this general rule: "when the trial record alone conclusively shows that the defendant is entitled to no relief and when the record conclusively shows the contrary." *Id.* (quoting *United States v. Gaviria,* 116 F.3d 1498, 1512 (D.C.Cir.1997)); *see also United States v. Fennell,* 53 F.3d 1296, 1303–04 (D.C.Cir. 1995); *United States v. Poston,* 902 F.2d 90, 99 n. 9 (D.C.Cir.1990). Here the record conclusively shows that Glover is entitled to no relief.

Under the familiar two-part test enunciated in *Strickland v. Washington,* a defendant seeking to establish ineffective representation must show both "that counsel's performance was deficient," and that "the deficient performance prejudiced the defense." 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This means a defendant must show that his counsel's performance fell below "an objective standard of reasonableness" under prevailing professional norms, *id.* at 687–88, 104 S.Ct. 2052, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052. Glover fails to satisfy either part of the *Strickland* test.

 Glover's principal claim is that his trial counsel failed to cross-examine Jones, the government informant, regarding Jones' prior arrest for making a false statement while applying to purchase a firearm. But the record indicates that counsel instead elicited the same information through cross-examination of a DEA agent. *See* Tr. 325–26. Arguably, this strategy was more effective because it prevented Jones from explaining away or minimizing the arrest. In any event, there was nothing ineffective about it and we decline to second-guess trial counsel's strategy.

 Glover also complains that his counsel failed to object to the admission of the diagram showing the location of Jones' store and Banneker High School, because there was no testimony that either had been in the same location at the time of the drug transactions. Such an objection would have been frivolous, because there is and was no dispute about the actual location of either building at the relevant time. Glover's other allegations about his trial counsel's asserted ineffectiveness, which we have carefully reviewed, are equally frivolous.

## VII

One final detail remains. While Glover has not raised the issue, the government notes that the forfeiture order entered in this case was not pronounced in Glover's presence as required by Federal Rule of Criminal Procedure 43(a). *See* Gov't Br. at 37 n.36. Rather than remand to the district court for compliance with this requirement and re-

---

6. We likewise reject Glover's one-sentence suggestion that by reclassifying his convictions as felonies, Congress "usurped the state's power to classify crimes committed within the state's jurisdiction" in violation of the Tenth Amendment. Congress did not seek to reclassify any offense for purposes of state law; the 1994 statute merely defined how prior conduct by the defendant would be treated for purposes of federal law.

sentencing, the government requests that we vacate the forfeiture count. If the case instead were remanded, the government advises, it would seek dismissal rather than bear the expense of bringing Glover back to court for this purpose alone. As Glover has not objected to this disposition, the forfeiture count is hereby vacated. *See Gaviria,* 116 F.3d at 1530. In all other respects, the judgment of the district court is affirmed.