Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued March 21, 2003          Decided May 20, 2003

No. 02-3042

UNITED STATES OF AMERICA,
APPELLEE

v.

GREGORIO HINDS,
APPELLANT

————

Appeal from the United States District Court
for the District of Columbia
(No. 00cr00173-01)

————

*Howard B. Katzoff*, appointed by the court, argued the cause and filed the brief for appellant.

*Mary G. Leary*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, and *John R. Fisher, Thomas J. Tourish, Jr., Thomas C. Taylor*, and *Roderick L. Thomas*, Assistant U.S. Attorneys.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: GINSBURG, *Chief Judge*, and EDWARDS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Defendant Gregorio Hinds contends that the district court erred in refusing to exclude a quantity of crack cocaine from the relevant conduct used to calculate his sentence under the United States Sentencing Guidelines (U.S.S.G.). We conclude that the provision of the guidelines upon which Hinds relies, Application Note 12 to U.S.S.G. § 2D1.1, is inapplicable, and reject his underlying claim of sentencing entrapment. We therefore affirm the judgment of the district court.

I

In late 1999, Hinds and his co-defendant, David Rollins, sold cocaine to an undercover police officer on three occasions. On November 22, 1999, they sold the officer 58.3 grams of powder cocaine (cocaine hydrochloride). On November 30, 1999, they sold him 60.3 grams of crack cocaine (cocaine base). And on December 7, 1999, they sold the same officer 60.6 grams of powder cocaine. All three transactions were audio- and videotaped.

On November 29, 1999, the day before the second transaction, the undercover officer asked Hinds if he could "rock up" the cocaine — that is, convert the cocaine from its powder form into crack, a process also known as "cooking."[1] That conversation, which was also recorded, proceeded as follows:

> Officer: Can you rock it up or do you know somebody for me?
>
> Hinds: I can do that for you.

---

[1] *See* U.S. SENTENCING COMM'N, REPORT TO CONGRESS — COCAINE AND FEDERAL SENTENCING POLICY 16 (May 2002) ("Crack cocaine is made by dissolving powder cocaine in a solution of sodium bicarbonate and water. The solution is boiled and a solid substance separates from the boiling substance. After the solid substance is dried, the crack cocaine is broken into 'rocks' . . . .").

Officer: You can do that for me?

Hinds: Yeah.

App. at 33. Following the conversation, Hinds asked a friend for assistance in rocking up the cocaine. Unbeknownst to Hinds, however, the friend was working as a confidential government informant, in cooperation with the undercover police officer. Although the informant declined to perform the conversion himself, he put Hinds in contact with another unidentified individual. Hinds brought powder cocaine to that individual, who cooked it into crack in Hinds' presence. On November 30, as the parties had agreed the previous day, Hinds delivered the crack cocaine to the undercover officer.

Hinds and Rollins were subsequently arrested and indicted on several charges related to the three drug transactions. On December 19, 2000, Hinds signed a written plea agreement in which he acknowledged that he was "accountable for at least 100 grams but less than 200 grams of cocaine powder and at least 50 grams but less than 150 grams of cocaine base, also known as crack." App. at 13. The same day, Hinds pled guilty to one count of conspiracy to distribute and possess with intent to distribute cocaine powder and cocaine base, in violation of 21 U.S.C. § 846. In its Presentence Investigation Report (PSR), the United States Probation Office determined that Hinds' adjusted offense level under the Sentencing Guidelines was 27, based on relevant conduct that included the 60.3 grams of crack and 118.9 grams of powder cocaine that Hinds sold to the undercover officer. PSR ¶¶ 16, 24.[2] That offense level, together with a criminal history category of I, yielded a guidelines sentencing range of 70 to 87 months. *Id.* ¶ 46; *see* U.S.S.G. ch. 5, pt. A.

---

[2] Hinds' base offense level was 32. *See* U.S.S.G. § 2D1.1(c)(4). He received a two-level reduction under the guidelines' "safety valve" provisions, U.S.S.G. §§ 2D1.1(b)(6), 5C1.2, and a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. *See* PSR ¶¶ 16, 17, 23, 24. Because the district court found that Hinds met the safety valve criteria, it sentenced him according to the guidelines rather than imposing the otherwise-mandatory statutory minimum of 10 years' imprisonment. *See* 18 U.S.C. § 3553(f).

At sentencing, Hinds disputed the calculation contained in the PSR. He argued that under U.S.S.G. § 2D1.1, Application Note 12, the court was required to exclude the 60.3 grams of crack from the relevant conduct used to calculate his sentence. If that amount had been excluded, or treated as powder cocaine, Hinds' adjusted offense level would have dropped to 13, resulting in a sentencing range of 12 to 18 months. *See* U.S.S.G. ch. 5, pt. A.[3] The district court rejected Hinds' argument, *see United States v. Hinds*, 190 F. Supp. 2d 1 (D.D.C. 2002), and subsequently sentenced him to 70 months' imprisonment, the bottom of the guidelines range.

## II

Application Note 12 to U.S.S.G. § 2D1.1 states, in relevant part:

> Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance . . . .
>
> . . . .
>
> In an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense. For example, a defendant agrees to sell 500 grams of cocaine, the transaction is completed by the delivery of the controlled substance — actually 480 grams of cocaine, and no further delivery is scheduled. In this example, the amount delivered more accurately reflects the scale of the offense. In contrast, in a reverse sting, the agreed-upon quantity of the controlled substance would more accurately reflect the scale of the offense because the amount actually delivered is controlled by the govern-

---

[3] The base offense level for at least 100 but less than 200 grams of cocaine powder is 18. U.S.S.G. § 2D1.1(c)(11). Applying the same two- and three-level reductions that Hinds received, *see supra* note 2, would have yielded an offense level of 13.

*ment*, not by the defendant. *If, however, the defendant establishes that he or she did not intend to provide, or was not reasonably capable of providing, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that he or she did not intend to provide or was not reasonably capable of providing.*

U.S.S.G. § 2D1.1, cmt. n.12 (emphasis added). Hinds contends that the portion of Note 12 italicized above required the district court to exclude the 60.3 grams of crack he sold to the undercover officer from the calculation of his offense level,[4] and that the court's failure to do so constituted reversible error.

---

[4] It might be argued that Hinds waived this contention at the plea stage. He entered a plea to conspiracy to distribute both powder cocaine and crack; signed a plea agreement specifically acknowledging that he was "accountable for . . . at least 50 grams but less than 150 grams of cocaine base, also known as crack, which quantity represents the total amount involved in [his] relevant criminal conduct," App. at 13; and further agreed not to seek any decreases in his base offense level other than the two downward adjustments expressly identified in the agreement, *see supra* note 2. *Cf. United States v. Calderon*, 163 F.3d 644, 646 (D.C. Cir. 1999) (holding that a defendant's claim for a downward sentencing adjustment was barred by her plea agreement not to seek any adjustment not specified in the agreement). Moreover, at the plea hearing, the court advised, and Hinds acknowledged, that the relevant conduct to which he had admitted likely indicated an adjusted offense level of 27 and a minimum sentence of 70 months' imprisonment, App. at 53–56, precisely the level and minimum sentence subsequently calculated by the Probation Office and applied by the court. Although the government's failure to make the waiver argument in the district court would not necessarily preclude us from relying on it here, *see In re Swine Flu Immunization Prods. Liability Litig.*, 880 F.2d 1439, 1444 (D.C. Cir. 1989) (holding that "an appellate court can affirm a district court judgment on the basis of 'any grounds which . . . support [it]' " (alterations in original)), we do not do so because the government's appellate brief expressly disclaimed reliance on the argument, Appellee's Br. at 20 n.11, and the defendant therefore has had no opportunity to respond to it.

We conclude that the district court correctly determined that Application Note 12 is inapplicable to Hinds' case.[5] When considering a challenge to a district court's sentencing determination, we review purely legal questions de novo and give "due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e); *see United States v. Kim*, 23 F.3d 513, 517 (D.C. Cir. 1994). In order to show that he should have been sentenced pursuant to Note 12, Hinds must establish that he "did not intend to provide" or "was not reasonably capable of providing" the agreed-upon quantity of the controlled substance. U.S.S.G. § 2D1.1, cmt. n.12. Hinds does not dispute that he intended to provide the crack: indeed, he expressly agreed to do so, contacted the informant for assistance with the conversion, brought the powder to the individual who performed the conversion, and then delivered the resulting product to the undercover officer.

Hinds does dispute that he was "reasonably capable of providing" the agreed-upon quantity of crack. That claim, however, is belied by the fact that he actually provided that quantity.[6] Hinds' real claim is that he would not have been

---

[5] We reject, however, the government's contention that Note 12 applies only to differences in drug quantity and not to differences in type, and hence that it is inapplicable here because Hinds does not dispute his ability to provide 60.3 grams of cocaine powder. *See United States v. Searcy,* 284 F.3d 938, 942 (8th Cir. 2002) (holding that Note 12 "logically . . . would apply to [differences in] the type of drugs"); *United States v. Munoz*, 233 F.3d 410, 414–16 (6th Cir. 2000) (applying Note 12 where the defendant substituted a different drug for the one he had agreed to sell). Application Note 12 expressly refers to the defendant's inability to provide "*the* agreed-upon quantity of *the* controlled substance," U.S.S.G. § 2D1.1, cmt. n.12 (emphasis added), and the narcotics statutes treat powder cocaine as a different controlled substance from crack, *compare, e.g.*, 21 U.S.C. § 841(b)(1)(A)(ii), *with id.* § 841(b)(1)(A)(iii). More-over, Hinds plainly disputes his ability to produce the quantity upon which he agreed with the undercover officer, since he contends that he was incapable of producing *any* amount of crack at all.

[6] That fact also distinguishes this case from *United States v. Munoz*, in which the Sixth Circuit ordered a sentence reduction

reasonably capable of providing the crack <u>without the assistance of the government informant</u>. He avers that when he agreed in the recorded telephone conversation to provide the crack, he did so "assum[ing]" that the informant would cook the powder for him. App. at 17. According to Hinds, the informant was the only person he knew who could accomplish the conversion.[7]

But the language of the Application Note does not contain the qualifier underlined above, and there is nothing in the note's context to suggest that the Sentencing Commission had it in mind. To the contrary, the context of the note — including its introductory sentences and illustrative cases — indicates that it was designed to guide courts in assessing culpability where the amount of the drug agreed upon and the amount of the drug actually delivered were different. In this case, the two were exactly the same.

We agree with the district court that Hinds' argument, "while couched in the language of Application Note 12," is really just "the kind of sentencing entrapment or sentencing factor manipulation argument consistently rejected by" this circuit. *Hinds*, 190 F. Supp. 2d at 4. As the district court explained, the essence of Hinds' argument is his contention that, but for the request and assistance of the government and its informant, he would have sold powder rather than crack and hence should be subject to the less stringent sentencing guideline provisions applicable to the former. *Id.* That is, indeed, an argument that this court has consistently rejected.

In *United States v. Walls*, for example, the defendants alleged that they converted powder cocaine into crack be-

---

where the defendant never provided the agreed-upon drug, delivering a different drug instead. 233 F.3d at 415.

[7] The government disputes that Hinds would have been unable to provide the crack in the absence of the informant, and the district court also expressed skepticism on this point. *See Hinds*, 190 F. Supp. 2d at 4. The court, however, apparently accepted the defendant's assertion *arguendo* for purposes of resolving the applicability of Note 12, and we do so as well.

cause the undercover agents to whom they were selling demanded it; in fact, one agent testified that he had insisted on the delivery of crack because he wanted to subject the defendants to more severe sentences. 70 F.3d 1323, 1328–29 (D.C. Cir. 1995). The defendants claimed that this constituted "sentencing entrapment," and that they should be sentenced as if they had distributed powder rather than crack. But the court rejected that claim, noting that the Supreme Court "has warned against using an entrapment defense to control law enforcement practices of which a court might disapprove." *Id.* at 1329 (citing *United States v. Russell*, 411 U.S. 423, 435 (1973)); *see also United States v. Shepherd*, 102 F.3d 558, 566 (D.C. Cir. 1997) ("In *Walls*, this court rejected the contention that insistence by government agents that cocaine be delivered in crack form constitutes 'sentencing entrapment.' "). Instead, *Walls* emphasized that the "main element in any entrapment defense is . . . the defendant's 'predisposition' — 'whether the defendant was an "unwary innocent" or, instead, an "unwary criminal" who readily availed himself of the opportunity to perpetrate the crime.' " 70 F.3d at 1329 (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)); *see also United States v. Glover*, 153 F.3d 749, 756 (D.C. Cir. 1998) (holding that even if the government had chosen to contract for a drug purchase within 1000 feet of a school to increase the defendant's sentencing exposure, the "usual elements of the entrapment defense — inducement and lack of predisposition — would still have to be shown" to make out a viable claim). The *Walls* court found that element lacking because the defendants' predisposition was clear:

> Persons ready, willing and able to deal in drugs — persons like [the defendants] — could hardly be described as innocents. These defendants showed no hesitation in committing the crimes for which they were convicted. Alone, this is enough to destroy their entrapment argument.

70 F.3d at 1329.[8]

---

[8] Those courts that have considered sentencing entrapment arguments in the context of Application Note 12 have similarly relied on

As in *Walls*, the district court here concluded that the facts of Hinds' case showed that he "was not induced by a government agent to do something he was not otherwise disposed, or at least willing, to do." *Hinds*, 190 F. Supp. 2d at 4. Regardless of whether he personally possessed the ability to convert powder into crack or knew others who could do so — a skill that can hardly be described as rocket science[9] — he "showed no hesitation" when the undercover agent asked him to provide the drugs in crack form. *Walls*, 70 F.3d at 1329. Rather, he "readily agreed," *Glover*, 153 F.3d at 757, immediately responding, "I can do that for you," App. at 33. And as in *Walls*, that fact alone destroys Hinds' sentencing entrapment claim. *See Walls*, 70 F.3d at 1329; *see also Shepherd*, 102 F.3d at 566–67.

Hinds argues that his case is distinguishable from *Walls* because, unlike the defendants there, he would not have been able to convert his powder into crack but for the informant's active involvement. But this, too, is merely an incomplete entrapment defense in disguise. As in many undercover sting operations, what the government informant did here was to facilitate the defendant's commission of a crime. And whether such facilitation rises to the level of entrapment again depends on whether the government induced the defendant to commit a crime for which he lacked predisposition. *See Mathews*, 485 U.S. at 63; *Glover*, 153 F.3d at 756. As the Supreme Court recently said in the course of holding that the impossibility of achieving the object of a conspiracy does not bar prosecution of the conspirators, there is no reason to modify "a different branch of the law" — there conspiracy

---

the defendant's predisposition as the decisive factor for the success of the claim. *See Searcy*, 284 F.3d at 942 (holding that, although Application Note 12 does require the exclusion of "the amount of drugs that flow from sentencing entrapment," the defendant must establish "a lack of predisposition to commit the crime" to qualify as having been entrapped); *see also United States v. Estrada*, 256 F.3d 466, 475 (7th Cir. 2001) (finding it unnecessary to determine whether Application Note 12 addresses the issue of sentencing entrapment because the defendant possessed the necessary predisposition to commit the crime).

[9] *See supra* note 1; *see also supra* note 7.

law, here sentencing law — "to forbid entrapment-like behavior that falls outside the bounds of current entrapment law." *United States v. Jimenez Recio*, 123 S. Ct. 819, 823 (2003).[10]

Finally, Hinds contends that "the government informant's actions in this case constituted egregious government misconduct" that warrants exclusion of the crack cocaine from Hinds' guidelines calculation. Appellant's Br. at 20. It is true that *Walls* acknowledged that, under certain circumstances, government misconduct might give a defendant a cognizable due process claim:

> If the propriety of the agents' conduct had any significance, it would be with respect to the following dictum in *Russell*: "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from involving judicial processes to obtain a conviction."

*Walls*, 70 F.3d at 1329 (quoting *Russell*, 411 U.S. at 431–32). That acknowledgment, however, came with two caveats. First, the court noted that such a claim would go to the validity of the defendant's conviction, rather than of his sentence:

> Whatever vitality the outrageous-conduct defense might have [for setting aside a conviction], and we doubt that it has much, we conceive of no basis for allowing this defense, or some variant of it, to reduce a defendant's sentence. . . . [I]f the government's actions were not so

[10] In *Jimenez Recio*, the police seized a truckload of narcotics and set up a sting by having the drivers page their contact as if nothing had happened. The defendants were arrested when they arrived on the scene and attempted to drive the truck away. The Supreme Court rejected the contention that, because the seizure rendered the object of the conspiracy impossible to achieve, the defendants could not be prosecuted in the absence of evidence that they joined the conspiracy prior to the seizure. Such a rule, the Court warned, "would reach well beyond arguable police misbehavior, potentially threatening the use of properly run law enforcement sting operations." *Jimenez Recio*, 123 S. Ct. at 823.

outrageous that judicial processes to obtain a conviction were barred — if, in other words, there were no violation of the Due Process Clause — it follows that those actions cannot serve as a basis for a court's disregarding the sentencing provisions.

*Id.* at 1329–30 (internal quotation marks and citation omitted). Second, *Walls* held that in order to successfully raise such a due process claim, a defendant must establish that the government had committed "'coercion, violence, or brutality to the person.'" *Id.* at 1330 (quoting *United States v. Kelly*, 707 F.2d 1460, 1476 (D.C. Cir. 1983)). The informant's actions in this case — which amounted to nothing more than acceding to Hinds' request for help in converting cocaine powder into crack — plainly do not rise to that level.

## III

For the foregoing reasons, we reject the defendant's attacks on his sentence and affirm the judgment of the district court.