# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 1, 2008       Decided June 13, 2008

No. 05-3091

UNITED STATES OF AMERICA,
APPELLEE

v.

NATHANIEL LAW,
APPELLANT

————

Consolidated with
05-3092, 05-3120

————

Appeals from the United States District Court
for the District of Columbia
(No. 03cr00311-01)
(No. 03cr00311-02)
(No. 03cr00311-04)

————

*Robert A. Ratliff* argued the cause and filed briefs and *Jonathan Zucker* filed a brief for appellant William Farrell.

*Michael T. Morley* argued the cause for appellant Nathaniel Law. With him on the briefs was *Katherine Leong*.

*Joseph Virgilio*, appointed by the court, argued the cause and filed the briefs for appellant Carroll Fletcher.

*Katherine M. Kelly*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese, III*, *Mary B. McCord*, *Kenneth F. Whitted*, and *George P. Eliopoulos*, Assistant U.S. Attorneys. *John P. Gidez*, Assistant U.S. Attorney, entered an appearance.

Before: GINSBURG, BROWN, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

PER CURIAM: Appellants William Farrell, Nathaniel Law, and Carroll Fletcher were convicted by a jury of conspiring to traffic in narcotics and of numerous related crimes. Each appellant raises a number of objections to his convictions and sentence. We affirm in all respects except that we reverse Farrell's conviction for conspiring to launder money, one of Law's convictions for distributing cocaine base, and Fletcher's conviction for maintaining a drug residence. The cases are remanded to the district court for re-sentencing consistent herewith.

## I. Background

In the fall of 2000, the Federal Bureau of Investigation launched a three-year investigation into the appellants' trafficking in narcotics. The FBI initially gathered information about the appellants' operations by monitoring their communications and learning of several locations they used, including a recreation center at 4th St. and Rhode Island Ave. N.E. (the Center), the Shiloh Baptist Church at 9th St. and P St. N.W., a four-unit apartment building at 2002 Rosedale St. N.E., an apartment at 200 K St. N.W., and a

KFC restaurant at Florida Ave. and North Capitol St. N.E. Through its continued monitoring of the appellants' communications and of these locations, the FBI gathered evidence against the appellants and others, including Thomas Jackson, Ricardo Atcherson, Renaldo Mason, Harry Jackson, Ronald Valentine-Bey, and Lynn Cyrus. Thomas Jackson, Atcherson, Mason, Harry Jackson, Valentine-Bey, and Cyrus, all of whom then provided further information about the appellants' activities, participated in controlled purchases from the appellants, and testified at trial.

The Government introduced compelling evidence that the appellants distributed powder cocaine, cocaine base (also known as crack cocaine) and heroin on numerous occasions and that they did so pursuant to an agreement among themselves. For example, Thomas Jackson testified that Farrell ordinarily dealt with "the connection," meaning the source of their drugs, but for a time Farrell, afraid the police were monitoring his actions, had Fletcher deal with the source. During that period, Thomas Jackson bought 15 kilograms or more of powder cocaine from Fletcher. After Fletcher failed to pay the connection as required, Farrell resumed control over relations with the connection, and Fletcher introduced Thomas Jackson to Farrell so that Fletcher "won't be in the middle of it" anymore. Thomas Jackson testified he bought more than three kilograms of powder cocaine from Farrell. Harry Jackson testified Fletcher sold heroin to him twice and arranged for Farrell to sell heroin to him once. Cyrus often bought crack cocaine from Fletcher, who was sometimes accompanied by Law. On one occasion, Fletcher arranged for Cyrus to buy 62 grams of crack cocaine from Law. Mason testified Law sold him at least nine kilograms of powder cocaine between late 2000 and early 2003 and at least 250 grams of heroin in the summer of 2003. Mason also testified that when he would ask Law for narcotics, Law would first call Farrell, and sometimes Farrell

would accompany Law to the transaction; indeed, Law told Mason that Farrell was his source.

Throughout the period of the conspiracy, Karlene Thomas owned the Rosedale building, but from 1993 until at least September 2001, she relinquished control over the building to her former boyfriend, Nathaniel Moore. He in turn gave control to Farrell, who made the monthly mortgage payment of about $600 in Karlene Thomas's name and collected and kept the rent from the tenants. Law resided in apartment #3 in the Rosedale building. In 2002, FBI agents arrested Law and then searched his apartment pursuant to a valid warrant. The agents discovered various drug-related items, such as a scoop, the box to a coffee grinder, and digital scales, each with a residue of crack cocaine on it.

During their search of Law's apartment, the agents also discovered that a key they had seized from Law during his arrest fit the lock to apartment #4, which was across the hall from Law's apartment. The agents called Karlene Thomas, who consented to their search of that apartment. There they found 15 grams of crack cocaine, 17.7 grams of heroin, business cards for Farrell and Fletcher, a loaded shotgun, and various drug-related items, such as razor blades, syringes, a strainer, a coffee grinder that matched the coffee grinder box found in Law's apartment, and digital scales, each with a residue of crack cocaine on it.

FBI agents and Metropolitan Police officers also found incriminating evidence when they arrested Farrell and searched his home. In November 2003, an officer conducting a traffic stop of Farrell seized $3,411, of which $3,030 was in bills the FBI had provided to Mason earlier that day for a controlled drug purchase from Farrell and Law. About a week later, Farrell recovered the $3,411 from the police by presenting a receipt for a savings bond in the amount of

$10,368, which he had cashed shortly before the money was seized. Three days later, agents executed a search warrant at Farrell's home, where they found more than $19,000 in cash, $1,100 of which was in bills used by Mason in the aforementioned controlled purchase. Agents also found a gun, money order receipts in Karlene Thomas's name for mortgage payments on the Rosedale building, and various drug-related items, such as plastic baggies, a scale, and paper face masks.

As these facts suggest, and as the jury found, Farrell was the leader of the conspiracy. He controlled the Rosedale building, at which the appellants conducted some of their drug activities. Law and Fletcher often consulted Farrell before entering into a transaction. And Farrell managed the connection.

The appellants were arrested late in 2003. A grand jury indicted them on a number of charges, as follows:

• *Count 1*: Farrell, Law, and Fletcher were charged under 21 U.S.C. §§ 841 and 846 with conspiring to possess with intent to distribute and conspiring to distribute five kilograms or more of cocaine, 50 grams or more of cocaine base, and 100 grams or more of heroin.[1]

• *Count 2*: Farrell was charged under 18 U.S.C. § 1956 with conspiring to launder the proceeds of his drug transactions by making mortgage payments on the Rosedale building in Karlene Thomas's name.

---

[1] Count 1 also charged Jeffrey Dunbar and Caul Watson with the conspiracy and Count 4 also charged Watson with maintaining a drug residence at 200 K St. N.W. The jury acquitted Dunbar and Watson pleaded guilty and has not appealed.

• *Count 3*: Farrell, Law, and Fletcher were charged under 21 U.S.C. § 856 with maintaining a residence (the Rosedale building) for the purpose of manufacturing, distributing, and using a controlled substance.

• *Count 4*: Fletcher was charged under 21 U.S.C. § 856 with maintaining a residence (the apartment at 200 K St. N.W.) for the purpose of manufacturing, distributing, and using a controlled substance.

• *Count 5*: Fletcher was charged under 21 U.S.C. § 841 with distributing 50 grams or more of cocaine base through a purchase made by Cyrus.

• *Counts 6-11*: Law was charged under 21 U.S.C. § 841 with six counts of distributing five grams or more of cocaine base, to wit, six controlled purchases made by Atcherson.

• *Count 12*: Law was charged under 21 U.S.C. § 860 with distributing cocaine base within 1,000 feet of a school through a controlled purchase made by Atcherson.

• *Count 13*: Farrell, Law, and Fletcher were charged under 18 U.S.C. § 2 and 21 U.S.C. § 841 with possessing with intent to distribute five grams or more of cocaine base, which was discovered in apartment #4 of the Rosedale building.

• *Count 14*: Farrell and Law were charged under 21 U.S.C. § 841 with distributing cocaine through a controlled purchase made by Mason.

• *Count 15*: Farrell was charged under 21 U.S.C. § 841 with distributing cocaine through a controlled purchase made by Valentine-Bey.

The jury acquitted Fletcher on Count 3 but convicted the appellants of all other counts. In a special verdict, the jury also found Farrell was "an organizer or leader" of a drug trafficking organization, which increased by four his offense level for purposes of sentencing, *see* U.S. SENTENCING GUIDELINES MANUAL (U.S.S.G.) § 3B1.1(a) (2007); and that Farrell should forfeit assets in an amount equal to the proceeds of his drug trafficking offenses in Counts 1, 14, and 15 ($874,800) and the funds involved in the money laundering offense in Count 2 ($28,560), *see* 21 U.S.C. § 853(a); 18 U.S.C. § 982(a)(1).

The district court sentenced Farrell to 324 months in prison on each of Counts 1, 13, 14, and 15, and to 240 months in prison on each of Counts 2 and 3, all sentences to run concurrently. The district court sentenced Law to life in prison without release on Count 1 and concurrently to 212 months in prison on each of Counts 3 and 6-14. Finally, the district court sentenced Fletcher to life in prison without release on Counts 1 and 5, 240 months in prison on Count 4, and 250 months in prison on Count 13, all sentences to run concurrently. Law's and Fletcher's sentences on Counts 1 and 5 were enhanced to life in prison without release as mandated by 21 U.S.C. § 841(b)(1)(A) because they each had "two or more prior convictions for a felony drug offense."

The appellants raise a variety of challenges to their convictions and sentences. We address each appellant's arguments in turn.

## II. William Farrell

Farrell advances several challenges to his convictions and sentences. First, he claims the evidence was insufficient to support his conviction for conspiring to launder money. We agree and therefore reverse that conviction. Second, he

argues the district court erred in admitting evidence that he had failed to file federal income tax returns. Even if that was an error, it was either harmless or moot, depending upon which conviction is at issue. Third, Farrell argues the district court erred in permitting the use of two particular binder tabs accompanying the transcripts of the recorded conversations played at trial. We find no such error. Fourth, Farrell contends his sentences were unreasonably harsh. This contention lacks merit. Finally, Farrell joins both of Fletcher's challenges to the Government's expert opinion testimony, which, as discussed in Part IV, we reject.

A. The Conspiracy to Launder Money

At trial, the Government argued and the jury found Farrell had agreed with Fletcher to launder the proceeds of their narcotics activities by using those proceeds to pay the mortgage on the Rosedale building, which was owned by Karlene Thomas. Farrell contends the evidence was not sufficient to support the jury's verdict. "We review the sufficiency of the evidence *de novo*, considering it in the light most favorable to the government, to determine whether any rational trier of fact could have found [the defendant] guilty beyond a reasonable doubt of all the required elements of the crime." *Valdes v. United States*, 475 F.3d 1319, 1322 (D.C. Cir. 2007) (en banc).

The federal money-laundering statute proscribes the "conversion of cash into goods and services as a way of concealing or disguising the [illegal] wellspring of the cash." *United States v. Wynn*, 61 F.3d 921, 924 (D.C. Cir. 1995) (quotation marks omitted).[2] We have emphasized that 18

---

[2] More precisely, the statute in relevant part punishes one who, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts

U.S.C. § 1956 "prohibits the *laundering* of money, not merely the *spending* of money obtained illegally. Thus, the Government must prove that [the subject transaction was] motivated by a desire to conceal or disguise the source or the ownership of the money." *Id.* (citation omitted); *see also United States v. Hall*, 434 F.3d 42, 50 (1st Cir. 2006) ("the money laundering statute does not criminalize the mere spending or investing of illegally obtained assets"). Accordingly, it is generally the case that "[i]f transactions are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, they do not violate the money laundering statute." *United States v. Majors*, 196 F.3d 1206, 1213 (11th Cir. 1999) (quotation marks omitted); *cf. Cuellar v. United States*, No. 06-1456, 2008 U.S. LEXIS 4698, at 15-19 (U.S. June 2, 2008) (holding § 1956(a)(2)(B)(i), which prohibits transportation designed to conceal certain attributes of illegally obtained funds, does not require proof that defendant attempted to create appearance of legitimate wealth, but recognizing such attempt may signal violation of money laundering statute and indeed is manner in which "classic money laundering" occurs). The statute also punishes as a principal anyone who conspires to launder money. § 1956(h).

Farrell argues the evidence was insufficient to show the mortgage payments were designed to conceal the source of the funds rather than to "profit[] from the excess rental income or[ to] maintain[] the premises to further drug trafficking." To be sure, the Government's evidence "need

---

or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity [while] knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i).

not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Lam Kwong-Wah*, 924 F.2d 298, 302 (D.C. Cir. 1991) (quotation marks omitted). But when faced with an innocent explanation sufficiently supported by the evidence to create a reasonable doubt about the defendant's guilt, the Government's burden is to present evidence sufficient to dispel that doubt. The need for evidence that excludes such an innocent explanation is especially important in relation to a charge of money laundering because of the fine line between laundering and merely spending illicit funds.

Both of Farrell's innocent explanations create a reasonable doubt about his guilt such that no reasonable jury could conclude that Farrell's purpose in paying the mortgage on the Rosedale building was to conceal the source of illegally obtained funds. First, the evidence showed that Farrell profited from the excess rental income derived from the building. The monthly mortgage payment on the Rosedale building was about $600. The monthly rent for each apartment in the Rosedale building, which Farrell collected when he was paying the mortgage, was typically $400 or $450. Although all the apartments were not always rented, it is easy to see that Farrell's rental income exceeded his mortgage payments, making his decision to take over the mortgage a profitable one. Second, the evidence showed Farrell maintained the Rosedale building to further his drug trafficking, for which maintaining he was in fact convicted on Count 3. As detailed below, Farrell's paying the mortgage and collecting the rent were integral to the control he exerted over the Rosedale building. In sum, there was ample evidence to show Farrell paid the mortgage to gain present benefits, not to create the appearance of legitimate wealth.

At trial, the Government presented and now points to three pieces of evidence intended to show Farrell paid the mortgage in order to conceal the source of his funds. We find the Government's evidence insufficient to its task – it neither makes for a strong affirmative case nor tends to exclude Farrell's innocent explanations.

First, the Government notes Farrell paid the mortgage in Karlene Thomas's name rather than in his own. Farrell did this sometimes by purchasing a money order in Thomas's name and then making the money order payable to the mortgagee, and sometimes by giving the money to Thomas to make the payment. The Government cites two decisions in which a court of appeals upheld the conviction of a person who had laundered money by making a payment in another's name. Those cases, however, involved circumstances that tended to exclude the possibility that the defendant was merely spending the illicit funds. In neither case was there any plausible legitimate reason for using another's name. In both cases the pseudonymous purchase provided the defendant no benefit other than a way to convert the illegally obtained funds; that is, the purchase merely created the appearance of legitimate wealth. Indeed, in one case the defendant admitted he was trying to launder the money. *See Wynn*, 61 F.3d at 925-26 (one defendant obtains and uses cashier's checks in other defendant's name to buy luxury vehicle and soon thereafter to pay difference between trade-in value of that vehicle and price of another); *Hall*, 434 F.3d at 52-53 (defendant bought truck with money order in sister's name and told acquaintance account from which funds came was "fictitious 'inheritance account' in which the money 'was cleaned'").

No such circumstance is present in this case. There was a simple, benign reason for paying the mortgage in Thomas's name: Thomas was the mortgagor, making it easier for Farrell

to pay the mortgage in her name than to make clear to the mortgage company that payments in his name were to be applied to her mortgage. And, as discussed above, making the mortgage payments provided Farrell with legitimate benefits, namely, rental income and a base for his drug operation. Therefore, under the circumstances Farrell's decision to pay the mortgage in Thomas's name does not reasonably suggest a purpose to conceal the source of the funds. *Cf. United States v. Sanders*, 928 F.2d 940, 946 (10th Cir. 1991) (insufficient evidence of purpose to conceal where defendant purchased cars in daughter's name but defendant was "present at these purchases[, was] readily identified by the respective salespersons involved," and "conspicuously" used the cars).

Second, the Government points to Farrell's alleged "belief that, by paying the mortgage from 1993 to 2001, he acquired a property interest in the building." The Government does not, however, explain how this alleged belief shows a design to conceal the source of the funds. We find this alleged belief has little or no probative value because it does not distinguish mere spending from laundering; legitimate spending to pay for real estate ordinarily comes with the expectation of acquiring a property interest.

Third, the Government emphasizes that Farrell "refuse[d] to deal with government entities regarding the Rosedale building, such as paying sanitation bills or helping with tax filings, and [refused] to provide Thomas with money to handle such bills."[3] Left again to grope for the significance of this allegation, we find none. For starters, this allegation

---

[3] We understand the evidence to show, and the Government's position to be, that Farrell refused to pay for the preparation of "tax papers" for the building, not that he refused to pay the taxes on the building.

relates not to the use (and thus possible cleansing) of the illicit funds but rather to the funds' non-use, the significance of which is at best unclear. Moreover, Farrell's refusal to pay sanitation and tax-preparation bills may have reflected nothing more than his desire to avoid diminishing the profit from his investment in the Rosedale building. If Thomas was willing to pay these bills even while Farrell was collecting the rent, then Farrell had no incentive to pay them. Or Farrell may have avoided paying the bills because he did not want his name associated with a building he knew was used for drug activities.

In sum, no reasonable jury could conclude that Farrell's purpose in paying the mortgage on the Rosedale building was to conceal the source of illegally obtained funds. We therefore vacate Farrell's conviction on Count 2 for conspiring to launder money.[4]

B. The IRS Records

Farrell contends the district court erred in admitting into evidence certified statements by the IRS that he had not filed income tax returns for the years 1998 through 2002. The district court admitted these statements not to prove Farrell was guilty of tax evasion but rather to rebut Farrell's contention that he had "legitimate income and not illegitimate income" from "drug trafficking." Under Federal Rule of Evidence 404(b), evidence of other "crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but it may be admissible for another purpose. Because the introduction of such evidence runs the risk the jury will convict the defendant

---

[4] In consequence, we need not reach Farrell's contention that the evidence was insufficient to establish an agreement with Fletcher to commit this offense.

simply for being a bad person, the district court must be alert to whether the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice," in which case the court must exclude it. FED. R. EVID. 403. "We accord substantial deference to the district court's rulings on these issues." *United States v. Lawson*, 410 F.3d 735, 741 (D.C. Cir. 2005); *see also Henderson v. George Wash. Univ.*, 449 F.3d 127, 133 (D.C. Cir. 2006) ("the appellate court is extremely wary of second-guessing the legitimate balancing of interests undertaken by the trial judge" pursuant to Rule 403).

Farrell contends admitting the IRS records violated both Rule 404(b) and Rule 403. He argues the IRS records were inadmissible under Rule 404(b) because they were "probative of nothing more than that [he] just was a tax deadbeat and he was a bad citizen." Farrell argues the evidence was inadmissible under Rule 403 because whatever probative value it might have had was "substantially outweighed by the danger of unfair prejudice," specifically the risk that the evidence would unfairly suggest he was the "type of dishonest person" who would deal drugs near a church or launder money. As Farrell points out, the district court did not give a limiting instruction as to the purpose for which the IRS records were admitted.

We need not decide whether the district court erred, as Farrell claims. To the extent the purported errors relate to Farrell's conviction on Count 2 for money laundering, they are moot because we reverse that conviction on a different ground, *supra*. To the extent they relate to Farrell's drug-related convictions on Counts 1, 3, and 13-15, they were harmless. An error is harmless and thus to be disregarded if it "does not affect substantial rights." FED. R. CRIM. P. 52(a); *see* 28 U.S.C. § 2111.

> In determining whether an error is harmless, the court measures the harm in terms of whether the error had substantial and injurious effect or influence in determining the jury's verdict, not merely whether the record evidence [would be] sufficient absent the error to warrant a verdict of guilt. Consequently, an evidentiary error is harmless if ... the case is not close ....

*Ashcraft & Gerel v. Coady*, 244 F.3d 948, 953 (D.C. Cir. 2001) (quotation marks and citation omitted). Of course, "the Government bears the burden of proving an error is 'harmless.'" *United States v. Perry*, 479 F.3d 885, 891 (D.C. Cir. 2007).

In this case, none of the drug charges was "close"; the Government presented overwhelming evidence of Farrell's guilt on each drug-related count, to wit:

*Count 1*: The Government was required to prove Farrell agreed "knowingly or intentionally ... to ... distribute ... or possess with intent to ... distribute" five kilograms or more of powder cocaine, 50 grams or more of crack cocaine (*i.e.*, cocaine base), or 100 grams or more of heroin. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii)-(iii), (b)(1)(B)(i) & 846. We detailed in Part I some of the evidence in support of this charge: Farrell and Fletcher coordinated their dealings with a drug source, their sales of powder cocaine to Thomas Jackson, and their sale of heroin to Harry Jackson; Farrell and Law jointly sold powder cocaine to Mason; and Law told Mason that Farrell was his source for the powder cocaine and heroin he was selling to Mason. The evidence in support of the other drug counts, which we consider presently, also shows Farrell's participation in the conspiracy.

*Count 3*: The Government was required to prove Farrell "knowingly open[ed], lease[d], rent[ed], use[d], or

maintain[ed]" the Rosedale building "for the purpose of manufacturing, distributing, or using" powder cocaine, crack cocaine, or heroin. *See* 21 U.S.C. § 856(a). As detailed in Part I, both apartment #3, which was rented by Farrell's co-conspirator Law, and apartment #4, which was evidently not rented, contained drugs and drug paraphernalia. Apartment #4 also contained links to Farrell, as well as to Fletcher and Law, specifically, Farrell's and Fletcher's business cards and a coffee grinder matching a piece of a coffee grinder in Law's apartment. And although Karlene Thomas was the Rosedale building's owner of record, Farrell had effective control. Not only was he collecting the rent from the tenants and paying the mortgage, he was also doing the leasing and he excluded Thomas by changing the locks on the building.

*Count 13*: Much of the evidence that establishes Farrell's guilt under Counts 1 and 3 also proves he knowingly or intentionally possessed with intent to distribute the 15 grams of crack cocaine found in apartment #4 of the Rosedale building – or at least aided and abetted that possession, for which he would be liable as a principal. *See* 21 U.S.C. § 841(a)(1), (b)(1)(B)(iii); 18 U.S.C. § 2.

*Count 14*: The Government was required to prove Farrell knowingly or intentionally distributed powder cocaine. *See* 21 U.S.C. § 841(a)(1), (b)(1)(C). On November 25, 2003, Mason, who was cooperating with FBI agents, met Law outside Law's aunt's house, where he gave Law $3,500 in marked bills for 125 grams of powder cocaine. Law did not, however, give Mason the cocaine at that time; rather, they agreed Law would give Mason the drugs later that day at the Shiloh Baptist Church. Farrell entered the church some 20 to 30 minutes after Law had done. Five to ten minutes later, Farrell and Law exited the church together and got into Farrell's van. After Mason arrived, Law left Farrell's van carrying a brown paper bag containing powder cocaine,

which he gave to Mason in Mason's car. That night, a Metropolitan Police officer conducting a traffic stop of Farrell seized $3,411, of which $3,030 was in marked bills the FBI had provided to Mason earlier that day for the controlled purchase from Law.

*Count 15*: As with Count 14, the Government was required to prove Farrell knowingly or intentionally distributed powder cocaine to Valentine-Bey. On November 26, 2003, at the direction of FBI agents, Valentine-Bey bought 250 grams of powder cocaine from Farrell outside the Shiloh Baptist Church.

Farrell argues the admission of the IRS records showing he had failed to file tax returns for several years was nonetheless prejudicial because the records "bolstered the credibility of the cooperating witnesses whose testimony was the core of the government's proof of the narcotics conspiracy." Farrell's theory appears to be that, insofar as the cooperating witnesses testified about Farrell's drug activities, their testimony was bolstered by the inference Farrell fears the jury drew from the IRS records, namely, that Farrell was dishonest and therefore the type of person who would deal drugs as charged. Farrell advances no reason, however, to doubt the credibility of the cooperating witnesses upon whose testimony the Government built its case against him, and so his objection founders; an error that bolsters the credibility of a witness is harmless unless that witness's testimony is "otherwise[ ]suspect." *United States v. Cunningham*, 145 F.3d 1385, 1394 (D.C. Cir. 1998); *see also United States v. Lampkin*, 159 F.3d 607, 613 (D.C. Cir. 1998) (error not harmless where witness's credibility "was very much in doubt throughout the trial").

Farrell's co-defendant Law, however, has questioned the credibility of one of those witnesses, namely, Mason. As

described above, Mason testified about his transactions with Law and about Law's relationship with Farrell. Attempting to undermine Mason's credibility, Law argues that "Mason made many vague and contradictory statements concerning the quantity of drugs he allegedly bought from Mr. Law"; that there was evidence contradicting Mason's testimony about where the transactions between Mason and Law occurred; and that Mason's testimony was motivated by his plea bargain, under which he would gain leniency from prosecutors for his own actions. The connection between Mason's testimony and any general inference of Farrell's bad character that the jury might have drawn from the IRS records is so attenuated that the IRS records could not have bolstered Mason's credibility, let alone affected the jury's decision with respect to Farrell. We conclude the admission of the IRS records was, if erroneous, harmless with respect to the drug-related charges.

C. The Binder Tabs

At trial, the Government played recordings of numerous phone calls between Farrell and others. To assist the jury in following those recordings, the Government provided tabbed binders of transcripts of the recordings. The Government contended ten of those recorded conversations were between Farrell and drug sources in New York, which in turn showed he had a leadership role in the conspiracy. Although the transcripts of those ten conversations were labeled as being between Farrell and an "Unknown Male," the Government placed seven of them behind a tab labeled "Farrell & NY Source #1" and the other three behind a tab labeled "Farrell & NY Source #2." Farrell disputed the Government's contention that he was speaking with drug sources in those conversations; the participants had not identified themselves in the recordings, and no witness at trial identified the people with whom Farrell was speaking. The jury nonetheless agreed with the Government, which resulted in the

enhancement of Farrell's sentences by virtue of his leadership role in the conspiracy. *See* U.S.S.G. § 3B1.1(a). Farrell contends the district court, pursuant to Federal Rule of Evidence 403, should have refused to let the Government use the tabs because their usefulness "was substantially outweighed by unfair prejudice." A "more neutral label, such as 'Farrell & Unknown Male,'" he argues, "would have just as effectively assisted the jury in turning to the appropriate section within the binder." We hold the district court did not abuse its discretion.

"The principal risk of indiscriminately permitting the use of transcripts by jurors is that ... the jurors may ... transform the transcript into independent evidence of the recorded statements." *United States v. Holton*, 116 F.3d 1536, 1540 (D.C. Cir. 1997). A district court, however, has discretion to permit the use of a transcript "for the limited purpose of being used as a jury aid [to] help prevent jury confusion and wasted time as a tape is being played," provided the court uses "procedures ... to ensure that the jury does not rely on one party's version of the transcript instead of the tape recording." *Id.* at 1541-43 (quotation marks omitted); *see also United States v. Slade*, 627 F.2d 293, 302-04 (D.C. Cir. 1980). In *Holton*, we prescribed certain precautionary procedures, including instructing the jurors "the tape recording constitutes evidence of the recorded conversations and the transcript is an interpretation of the tape," "they should disregard anything in the transcript that they do not hear on the recording itself," and if only one party submits a transcript, then "the jury must be informed that the transcript is only one party's version." 116 F.3d at 1542-43. Depending upon the circumstances, we pointed out, additional procedures may be necessary. *See id.* at 1543.

It is undisputed that the district court gave the requisite *Holton* instructions. Farrell claims the instructions were

nonetheless inadequate because they addressed only the "transcripts." The tabs, Farrell says, "were not part of the transcript, but were extraneous to the transcript." In order to agree with Farrell, we would have to conclude the district court was required to find that, in the absence of an instruction specifically addressing the tabs, the jury would believe it could consider the tabs as evidence. In light of the instructions the district court gave, we conclude the district court need not have attributed such a peculiar belief to the jury.

First, the tabs were obviously part of the Government's presentation and organization of the transcripts. More important, the clear import of the district court's instructions was that only the tapes were to be considered as evidence of the recorded conversations. When the binders were first presented to the jury, the court explained:

> The evidence in this case is what you hear on the tape recordings, not what is printed on these transcript pages. These transcript pages have been prepared and provided to you solely for whatever assistance they may be to you in identifying the speaker[s] who are speaking or the words that are spoken.

Similarly, after the close of the evidence, the district court instructed the jury: "Transcripts of these tape recorded conversations have been shown to you solely for your convenience ... in identifying the speakers as the[] recordings were being played. ... What you hear on the tape[s] themselves is evidence in the case." Although it might have been prudent for the district court to expand the *Holton* instructions expressly to reach the binders and tabs, we will not require district courts to presume the jury lacks common sense. We therefore reject Farrell's challenge to the use of the binder tabs.

D.  The Reasonableness of the Sentences

Farrell was sentenced to concurrent terms of 324 months imprisonment for each offense relating to a quantity of drugs, namely, Counts 1 and 13-15.  He contends these sentences were unreasonable because the district court "failed to take into account the increasing[ly] prevalent view that sentences based upon the crack cocaine Sentencing Guidelines were improperly harsh when compared to those issued for involvement with powder cocaine."

"[W]e ... review any sentence, whether within the [Sentencing] Guidelines range or not, to ensure that it is reasonable in light of the sentencing factors that Congress specified in 18 U.S.C. § 3553(a)." *United States v. Dorcely*, 454 F.3d 366, 374 (D.C. Cir. 2006) (quotation marks omitted).[5]  A "sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness." *Dorcely*, 454 F.3d at 376; *see Rita v. United States*, 127 S. Ct. 2456, 2462 (2007).

We reject Farrell's contention because, contrary to his assertion, the district court, when considering the factors enumerated in § 3553(a), clearly took account of the Guidelines' disparate treatment of sentences for crack and for

---

[5] Section 3553(a) "tells the sentencing judge to consider (1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) 'just punishment' (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution. The provision also tells the sentencing judge to 'impose a sentence sufficient, but not greater than necessary, to comply with' the basic aims of sentencing as set out above." *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007).

powder cocaine offenses. Indeed, the district court calculated the sentencing range as though Farrell's offenses involved powder rather than crack cocaine. The resulting sentencing range was 262-327 months imprisonment, rather than 360 months to life imprisonment. After noting that Farrell's crimes were not "victimless," that he was "quite along in age," and that his health was declining, the district court settled upon concurrent sentences of 324 months imprisonment for each of Counts 1 and 13-15, which was well below the Guidelines range for crack cocaine, but within (albeit near the high end of) the Guidelines range when crack cocaine is treated as powder cocaine. Thus the district court accounted for the relative harshness of sentences for crack cocaine offenses under the Guidelines; indeed, the court eliminated the disparity altogether.

Though Farrell's arguments for re-sentencing focus almost exclusively upon the Guidelines' disparate treatment of crack and of powder cocaine offenses, he throws the court a curveball at the end of his brief. In May 2007, the Commission amended the Guidelines to lower by two the base offense level for certain crack cocaine offenses, which would reduce but not eliminate the disparity. *See Sentencing Guidelines for United States Courts*, 72 Fed. Reg. 28,558, 28,571-73 (2007); Nat'l Fed. Defender Sentencing Res. Counsel, *Applying the Crack Amendments 101* (Nov. 1, 2007), *available at* http://www.fd.org/pdf_lib/crack.pdf.[6] Farrell asserts these amendments "are indicative of a shift

---

[6] The amended Guidelines took effect on November 1, 2007. *Sentencing Guidelines for United States Courts*, 72 Fed. Reg. at 28,558. The Commission subsequently voted to give retroactive effect to the amendments, effective March 3, 2008. *Sentencing Guidelines for United States Courts*, 73 Fed. Reg. 217, 217, 220 (Jan. 2, 2008). We express no view as to what effect, if any, these amendments have upon Farrell's sentences.

away from the draconian penalties for those involved with cocaine, *be it of a powder or crack variety.*" (Emphasis added.) But it does not follow from this recent effort to reduce the disparity between the sentences for crack and for powder cocaine offenses that the Commission is troubled by the sentences for powder cocaine offenses. Obviously, one can eliminate the disparity without altering the sentences for powder cocaine offenses, as the district court did here.

Finding Farrell's arguments without merit, we conclude his below-Guidelines sentences were reasonable.

### III. Nathaniel Law

Law argues the district court erred by denying his motion to suppress without holding an evidentiary hearing or allowing him to be present. We reject this challenge because the district court properly decided the motion as a question of law. Law claims the district court improperly denied his request for an entrapment instruction. We deny this claim because Law offered no evidence of inducement. Law also argues his life sentence was unlawful because (1) the district court improperly aggregated the amount of drugs involved in the conspiracy; (2) the government presented insufficient evidence of Law's involvement in a conspiracy that sold each drug quantity; and (3) his prior crimes were not felony drug offenses. We reject all three arguments because the district court rightly aggregated the drug amounts, the evidence was more than sufficient, and Law waived his argument that his prior crimes were not felony drug offenses. The government concedes that Law's conviction for selling crack cocaine, Count 11, merges with his conviction for selling the same drugs near a school, Count 12. Accordingly, we reverse that conviction and remand for re-sentencing. Finally, like Farrell, Law joins both of Fletcher's challenges to the

Government's expert opinion testimony, which, as discussed in Part IV, we reject.

A.  The Motion to Suppress

After executing a search warrant on Law's apartment (apartment #3) in the Rosedale building, FBI agents discovered a key seized from Law during his prior arrest fit the lock of the adjacent unit (apartment #4). Since the warrant did not authorize the search of this apartment, they asked landlord Thomas for permission to do so. She said the apartment was "currently vacant and [was] being used to store some furniture and other matters" and Law "might have a set of keys to Apartment #4, but could not provide details concerning why." After further discussion, she consented to the search of apartment #4. Inside, agents found drugs and other incriminating evidence. The district court rejected Law's motion to suppress this evidence without holding an evidentiary hearing or allowing him to be present.[7]

Law argues this was error. A defendant is entitled to an evidentiary hearing on his motion to suppress "only upon factual allegations which, if established, would warrant relief." *United States v. Thornton*, 454 F.2d 957, 967 n.65 (D.C. Cir. 1971). Under the Due Process Clause, a "defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure," and this can include a suppression hearing. *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987); *see United States v. Hodge*, 19 F.3d 51, 52-53 (D.C. Cir. 1994). Nevertheless, a defendant's presence is not required if the court can decide the suppression motion as a matter of law. *See Valdez v.*

---

[7] At the time, Law was in another state undergoing a competency evaluation.

*Gunter*, 988 F.2d 91, 93-94 (10th Cir. 1993). Accordingly, the viability of both of Law's claims – the right to an evidentiary hearing and right to be present – turns on whether the district court needed to resolve any disputes of material fact to decide Law's suppression motion.

Law argues the search of apartment #4 violated the Fourth Amendment because the agents had no search warrant. The district court concluded Thomas had authority to consent to the search and, even if she did not, the FBI agents reasonably believed she did. The second theory suffices for our purposes. "[C]onsent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170 (1974). While a landlord cannot ordinarily consent to a search of a tenant's home, *see Chapman v. United States*, 365 U.S. 610, 616-17 (1961), she can consent to a search of an unleased apartment, *see United States v. Kelly*, 551 F.2d 760, 764 (8th Cir. 1977). Even if a landlord does not have authority to consent to a search, agents may rely upon her assurance that she has such authority, if objective circumstances make reliance reasonable. *See Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990). Whether that reliance was reasonable is a question of law. *United States v. James*, 353 F.3d 606, 615 (8th Cir. 2003). Thus the question for us is whether, under Law's version of events, the FBI agents reasonably relied upon Thomas's representation that apartment #4 was unleased.

According to Law's motion to suppress, Thomas told the agents apartment #4 was "currently vacant and [was] being used to store some furniture and other matters" and that Law "might have a set of keys." Under these circumstances, the agents reasonably relied on Thomas's representation that she had authority to consent to a search of the apartment. After

all, Thomas told them the apartment was "currently vacant," which is the equivalent of being unleased, *see* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2527 (1981) ("vacant" means "not filled or occupied by an incumbent, possessor, or officer"), and landlords have authority to consent to searches of unleased units, *see Kelly*, 551 F.2d at 764. It was reasonable for the agents to believe Thomas knew the occupancy status of one of only four apartment units in her building. Admittedly, Thomas's inability to explain why Law had keys to the apartment makes this a closer case; but this fact, taken by itself, was not sufficient to undermine her credibility. Law points to *United States v. Whitfield*, 939 F.2d 1071 (D.C. Cir. 1991), where this court held the police did not reasonably rely on a mother's consent to search the room of her 29-year-old son. But the present case is far different because Thomas told the agents no one lived in the apartment. In sum, the district court did not err by refusing to hold an evidentiary hearing and by denying Law an opportunity to be present.[8]

B. The Entrapment Instruction

Law argues the district court improperly denied his request for an entrapment instruction. He was entitled to this instruction if there was "sufficient evidence from which a reasonable jury could find entrapment." *United States v. Glover*, 153 F.3d 749, 754 (D.C. Cir. 1998) (alterations omitted). We review the district court's decision not to give the instruction *de novo*, viewing the facts in the light most favorable to Law. *Id.* at 752.

---

[8] We decline to address whether Federal Rule of Criminal Procedure 43 ever applies to a suppression hearing, because that rule does not require a defendant be present at a "hearing on a question of law," as was the case here. FED. R. CRIM. P. 43(b)(3).

The entrapment defense protects an "otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law." *Jacobson v. United States*, 503 U.S. 540, 553-54 (1992). This defense "has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Glover*, 153 F.3d at 754. If the defendant meets the initial burden of proving government inducement, the government can rebut by demonstrating he was nevertheless predisposed to commit the crime. When a government informant buys drugs from a defendant, the defendant can show inducement by pointing to "evidence of reluctance" to sell the drugs or the informant's use of "persuasive overtures," beyond those "ordinarily present in a drug transaction." *Id.* While a government agent's appeal to friendship could, under some circumstances, be a "persuasive overture," we have never found such a plea "sufficiently strong" to satisfy this requirement. *See United States v. Evans*, 216 F.3d 80, 90 (D.C. Cir. 2000).

Nor is this the case to do so. Law sold powder cocaine to his friend Mason after Mason had become a government informant. Yet, Law had never been reluctant to sell drugs to Mason, as he had sold him powder cocaine for several years before Mason ever became an informant. Moreover, while Law and Mason were longtime friends, Mason denied using this friendship to get Law to sell him drugs and Law presented no evidence to the contrary. There is similarly no evidence to support Law's claim that Mason used the threat of force to induce the drug sale. Law also sold crack cocaine to Atcherson and an unnamed informant, but Law points to no evidence he was reluctant to make this sale; and, he offers no evidence that either Atcherson or the unnamed informant appealed to Law's friendship. Moreover, any negative inference that one could draw from the government's failure to tape-record Law's transactions with Mason and Atcherson

cannot make up for Law's failure to present any evidence of entrapment. In sum, Law failed to introduce sufficient evidence to meet his initial burden of showing government inducement.

## C. The Mandatory Life Sentence

21 U.S.C. § 841(a)(1) makes it unlawful for anyone "knowingly or intentionally ... to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." A defendant convicted of violating § 841(a) "shall be sentenced to a mandatory term of life imprisonment without release" if the violation involved either 50 grams or more of crack cocaine or 5 kilograms or more of cocaine powder, *and* the offender has two or more prior convictions for "felony drug offense[s]." The jury convicted Law, under 21 U.S.C. § 846, of conspiring, in violation of these provisions of § 841, to distribute 50 grams or more of crack cocaine (more precisely, of 150 grams or more), 5 kilograms or more of powder cocaine, and 100 grams or more of heroin, and the government showed he had been convicted of three prior felony drug offenses. Accordingly, the district court imposed a mandatory life sentence. Law argues we should overturn this sentence because: (1) the district court improperly aggregated the amount of drugs involved in the conspiracy; (2) the government presented insufficient evidence of Law's involvement in a conspiracy that sold each drug quantity; and (3) his prior crimes were not felony drug offenses. We reject the first two challenges and find Law waived the third.

### 1. The aggregation of drug amounts

A defendant convicted of conspiring to deal drugs in violation of § 846 "shall be subject to the same penalties as those prescribed for the offense" in § 841(a). 21 U.S.C.

§ 846. Law claims this means the district court can sentence a defendant convicted of conspiracy under § 846 only for the largest "offense" (violation of § 841(a)) within that conspiracy. Thus, if a conspiracy involves five sales of 10 grams of crack cocaine, the district court can only sentence the defendant like someone who sold 10 grams of crack cocaine, not like someone who sold 50 grams. Law argues the district court erred by allowing the jury to aggregate the drug quantities throughout the conspiracy, and then by relying on this figure to impose the mandatory life sentence. Since Law never raised this argument before the district court, we review for plain error. *See United States v. Coles*, 403 F.3d 764, 767 (D.C. Cir. 2005).

We join our sister circuits in holding a defendant convicted of conspiracy to deal drugs, in violation of § 846, must be sentenced, under § 841(b), for the quantity of drugs the jury attributes to him as a reasonably foreseeable part of the conspiracy. *See United States v. Pressley*, 469 F.3d 63, 65-67 (2d Cir. 2006) (per curiam); *United States v. Gori*, 324 F.3d 234, 237 (3d Cir. 2003); *United States v. Pruitt*, 156 F.3d 638, 644-45 (6th Cir. 1998). As the Supreme Court has explained, a "single agreement to commit several crimes constitutes one conspiracy." *United States v. Broce*, 488 U.S. 563, 570-71 (1989). As a result, a single violation of the conspiracy statute encompasses all of the crimes reasonably foreseeable within that conspiracy. *See United States v. Walker*, 160 F.3d 1078, 1093 (6th Cir. 1998) (a "conspiracy is a single violation of the drug laws, and the fact that this particular conspiracy was characterized by separate transactions is a fact of no legal significance"). Here, the conspiracy was dealing drugs, and thus the entire sum of the drugs within the conspiracy constituted a single conspiracy violation. Accordingly, the district court did not commit

plain error by relying on the jury's aggregated drug quantity determination in imposing the life sentence on Law.[9]

## 2. The sufficiency of the evidence

Law argues that even if the jury could aggregate the drug sales, the government did not present sufficient evidence that he took part in a conspiracy involving the alleged quantity of each of the three drug types. In evaluating Law's sufficiency challenge, "[w]e review the sufficiency of the evidence *de novo*, considering it in the light most favorable to the government, to determine whether any rational trier of fact could have found [Law] guilty beyond a reasonable doubt of all the required elements of the crime." *Valdes*, 475 F.3d at 1322.

We find the government presented ample evidence that Law took part in a conspiracy involving at least 50 grams of crack cocaine, 5 kilograms of powder cocaine, and 100 grams of heroin. "The drug conspiracy statute, 21 U.S.C. § 846, dispenses with the usual requirement of an overt act and requires only an agreement to commit" a violation of § 841(a). *United States v. Baugham*, 449 F.3d 167, 171 (D.C. Cir. 2006). Farrell supplied Law with drugs to sell, and both Fletcher and Farrell accompanied him during drug sales. Moreover, Law lived in the Rosedale building, which was a distribution center for the conspiracy. Inside of his apartment and the adjacent apartment #4, police found drugs, drug paraphernalia, and business cards for Farrell and Fletcher.

---

[9] Law's related Sixth Amendment claims that (1) his trial counsel was ineffective for failing to raise the aggregation argument, and (2) the jury did not find he conspired to sell a sufficient quantity of each drug type in a single transaction, fail for the same reason.

This is more than enough to show Law agreed to distribute drugs with Farrell and Fletcher.

In addition, the government presented overwhelming evidence as to the drug quantities in the conspiracy. We discuss only the sales in which Law personally participated, as those are sufficient to sustain his conviction:

*At least 50 grams of crack cocaine*: Cyrus testified Law sold him 62 grams of "cocaine," when Fletcher, Cyrus's regular supplier, went out of town. Law points out Cyrus only testified he bought "cocaine" from Law, not specifically crack cocaine. However, Cyrus testified: (1) he bought crack cocaine from Fletcher approximately 45 times, and over half those purchases were of 62 grams; (2) he bought powder cocaine from Fletcher only one time; (3) he paid Fletcher $2000 for 62 grams of crack cocaine; and (4) he paid Law $2000 for 62 grams of "cocaine" on the day in question. The jury could have concluded the "cocaine" Cyrus was referring to was crack – after all, that is what Cyrus almost always bought from Fletcher, at the same price.[10] If this is not enough, Law sometimes accompanied Fletcher when he made crack sales to Cyrus – involvement sufficient to give Law reasonable knowledge that the conspiracy sold far more than 50 grams of crack cocaine. In addition, Law sold Atcherson a total of 181.9 grams of crack cocaine over 6 transactions. The jury could reasonably have concluded at least some of these sales were part of the conspiracy. For example, Fletcher was near the scene for one sale and Law entered Fletcher's minivan during this transaction.

---

[10] There is also nothing to Law's argument that this deal was not in furtherance of the conspiracy, as the jury had ample evidence to conclude Law was simply taking on his co-conspirator's role.

*At least 5 kilograms of powder cocaine*:  Mason testified Law sold him between 125 and 250 grams of powder cocaine at least once a week between September 2000 and February 2003, which would total at least 13 kilograms.  At another point, he testified he bought powder cocaine at least 20 to 30 times from Law and added that he bought "at least" 9 kilograms in total.  Law challenges Mason's credibility because of this inconsistency and because Mason claimed some of the drug buys took place at the Center, even though it had been padlocked by 2001.  However, Mason never claimed he bought cocaine at the Center after it closed.  Moreover, this is merely an argument about credibility and we give "full play to the right of the jury to determine credibility."  *United States v. Foster*, 783 F.2d 1087, 1088 (D.C. Cir. 1986).  Finally, there is little doubt these sales were part of the conspiracy, as Mason testified Law told him his source was "brother," which was Farrell's nickname.

*At least 100 grams of heroin*:  Mason testified Law sold him 250 grams of heroin, which Farrell supplied.[11]

3.  The felony drug offenses

Law claims the district court improperly imposed a life sentence under § 841(b) because his three prior convictions were not "felony drug offenses."  We conclude Law has waived this objection by failing to raise it to the district court.

---

[11] In a footnote in his opening brief, Law suggests the insufficiency of the evidence was exacerbated by the prosecutor making prejudicial comments during closing argument.  While we see nothing wrong with the prosecutor's comments, we treat Law's argument as waived because he failed to develop it.  *See Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm'n*, 485 F.2d 786, 790 n. 16 (D.C. Cir. 1973).

21 U.S.C. § 851 establishes the procedural framework for deciding whether a defendant had been convicted of a prior felony offense. Under § 851(a), the government must file "an information" identifying the prior conviction. Under § 851(b), the district court must then tell the defendant he has to "affirm[] or den[y] that he has been previously convicted as alleged in the information," and that "*any challenge* to a prior conviction which is not made before sentence is imposed *may not thereafter be raised to attack the sentence*." § 851(b) (emphasis added). The defendant must then respond, in writing, under § 851(c), which explains, in pertinent part, "*[a]ny challenge to a prior conviction*, not raised by response to the information before an increased sentence is imposed in reliance thereon, *shall be waived unless good cause be shown for failure to make a timely challenge*." § 851(c)(2) (emphasis added). Here, the government alleged Law had been convicted of three prior felony drug offenses and Law did not dispute this claim.

Without citing any authority, Law argues the phrase "any challenge to a prior conviction" in subsections (b) and (c)(2) refers only to a collateral challenge to a prior conviction, not to arguments that the prior conviction was not a felony offense. The text of § 851 and its carefully defined framework doom his argument. As explained above, the government must first allege all aspects of a prior conviction, including felony offense status; the court must then tell the defendant he has to raise "any challenge"; and, finally, the defendant must bring "any challenge" or waive the argument. It strains credulity to argue "any challenge" refers only to collateral attacks on the prior conviction, as opposed to any challenges whatsoever to the government's claims as to the conviction, including allegations about offense status. *See United States v. Brooks*, 508 F.3d 1205, 1208-09 (9th Cir. 2007) (strongly suggesting the § 851 waiver applies to challenges to "the validity or *nature of [the defendant's]*

*conviction*") (emphasis added). Indeed, courts have regularly held the § 851 waiver applies to arguments that the prior conviction has not become final, even though these are not collateral challenges. *See, e.g.*, *United States v. VanDoren*, 182 F.3d 1077, 1083 (9th Cir. 1999); *United States v. French*, 974 F.2d 687, 696-97 (6th Cir. 1992) (as amended).

In this case, the government filed papers, under § 851(a), showing Law had been convicted of three felony drug offenses. The district court then informed Law, as required by § 851(b), that he would waive any challenge he did not raise now. Law did not bring "any challenge" under § 851(c). Accordingly, since Law did not argue his crimes were not felony drug offenses before the district court, and has not shown good cause for failing to do so, he may not now raise them "to attack the sentence." § 851(b).[12]

D. Other Sentencing Issues

The government concedes Law's conviction for selling crack cocaine to Atcherson, Count 11, merges with his conviction for selling the same drugs near a school, Count 12.

---

[12] In arguing his prior crimes were not "felony drug offenses," Law relies upon *United States v. West*, 393 F.3d 1302, 1305 (D.C. 2005), which held a crime is a "felony drug offense" only if it is *both* punishable by more than one year in prison *and* characterized as a felony by the punishing jurisdiction. However, after oral argument in this case, the Supreme Court decided *Burgess v. United States*, 128 S. Ct. 1572 (2008), which rejected the approach in *West* and held a "felony drug offense" is any offense "'punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country,'" regardless of how the punishing jurisdiction classifies it. *Id.* at 1573 (quoting 21 U.S.C. § 802(44)). Since all of Law's prior convictions were punishable by more than one year in prison, he would not have prevailed even if he did not waive this argument.

Conviction on both counts violates the Double Jeopardy Clause and we vacate the distribution conviction on Count 11 and remand for re-sentencing. *See United States v. Baylor*, 97 F.3d 542, 548 (D.C. Cir. 1996). During re-sentencing, the district court should address the inconsistency between Law's Judgment and Commitment Order, which states he was convicted for "distribution" on Count 13, and the indictment and jury verdict, which charge and find him guilty of "possession with intent to distribute."

## IV. Carroll Fletcher

We now turn to Carroll Fletcher's claims. First, Fletcher argues that the evidence was insufficient for a jury to convict him of Count 4, maintaining a drug residence at 200 K St. N.W. The Government concedes on appeal that the evidence is in fact insufficient; accordingly, we reverse Fletcher's conviction on that count and remand for re-sentencing. Second, Fletcher challenges his mandatory life sentences for his convictions on Counts 1 and 5. A life sentence is mandatory for certain drug offenders convicted under 21 U.S.C. § 841(b)(1)(A)(iii) and § 846 who have two prior felony drug convictions. Here, the Government relied on Fletcher's 1977 and 1987 drug convictions as the two prior felony drug convictions. Fletcher argues that (1) the 1977 conviction was "set aside" under the Federal Youth Corrections Act (FYCA) and (2) the Government did not sufficiently prove the conviction because it relied only on a docket sheet entry. Even assuming his 1977 conviction was set aside under the FYCA, however, the conviction still counts for purposes of sentencing under § 841(b). We need not decide at this stage whether the Government adequately proved the 1977 conviction: We are already remanding Fletcher's convictions for re-sentencing because we are reversing his drug-residence conviction; and on remand, the Government plans to provide additional proof of Fletcher's

1977 conviction. Third, Fletcher and his co-defendants Farrell and Law raise a Confrontation Clause challenge to expert witness testimony by a police detective; that argument is inconsistent with our precedents. Fourth, Fletcher, Farrell, and Law contend that the Government's expert forensic scientist gave improper expert testimony; we reject that claim.

## A. Maintaining a Drug Residence

The jury found Fletcher guilty of Count 4, maintaining a drug residence at 200 K Street in violation of 21 U.S.C. § 856(a)(1). Section 856(a)(1) makes it unlawful to "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance." *See United States v. Lancaster*, 968 F.2d 1250, 1254 (D.C. Cir. 1992). On appeal, Fletcher argues that the evidence shows that another person rented and maintained the 200 K Street apartment; Fletcher further contends that there was no evidence that he owned, leased, lived in, had a key to, or had any control over the apartment; the evidence showed only that he went there occasionally to carry out drug transactions. The Government concedes on appeal that the evidence is insufficient to support Fletcher's conviction on this count. Accordingly, we reverse Fletcher's § 856(a)(1) conviction; as the Government acknowledges, we must therefore remand Fletcher's case for re-sentencing.

## B. The Mandatory Life Sentence

The jury found Fletcher guilty of, among other counts, (1) conspiracy to possess with intent to distribute and conspiracy to distribute five kilograms or more of cocaine, 50 grams or more of cocaine base, and 100 grams or more of heroin in violation of 21 U.S.C. §§ 841 and 846 (Count 1) and of (2) distributing 50 grams or more of cocaine base in

violation of § 841 (Count 5). For each of these counts, the district court sentenced Fletcher to life imprisonment without release – a mandatory sentence for offenders such as Fletcher who were convicted under those provisions "after two or more prior convictions for a felony drug offense have become final." § 841(b)(1)(A); *see also* § 846 ("Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.").

Fletcher had two prior felony drug convictions: a 1977 conviction for possession with intent to distribute a controlled substance and a 1987 conviction for conspiracy to distribute a controlled substance. He argues that the § 841 and § 846 mandatory life sentences do not apply to him, however, because (1) the 1977 conviction was later "set aside" under § 5021 of the Federal Youth Corrections Act, and (2) the Government did not prove his 1977 conviction sufficiently. *See* Federal Youth Corrections Act, 18 U.S.C. § 5005 *et seq.*, (1976), *repealed by* Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, § 218(a)(8), 98 Stat. 1976, 2027.

Even if we assume Fletcher's 1977 conviction was set aside under the Federal Youth Corrections Act – a question we need not decide – the district court still must take it into account in determining his sentence under § 841(b). The term "set aside" and the related term "expunge" have unfortunately not acquired settled meanings. *Compare* U.S.S.G. § 4A1.2, cmt. n.10 (conviction removed from criminal record "for reasons unrelated to innocence or errors of law" such as a conviction removed from criminal record to serve a social policy goal, for example "to restore civil rights or to remove the stigma associated with a criminal conviction," is "set aside"), *with Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 115 (1983) (under Iowa law, "expunction does not alter

the legality of the previous conviction and does not signify that the defendant was innocent of the crime to which he pleaded guilty"). The FYCA uses the term "set aside" in the same way the Sentencing Commission does – to designate a conviction removed from a criminal record for policy reasons unrelated to innocence or legal error, namely, "to promote the rehabilitation of youth offenders." *Tuten v. United States*, 460 U.S. 660, 663-65 (1983). If expungement or set-aside of a conviction is designed to allow an individual to make a fresh start, then if the individual commits a later crime, he or she may forfeit the benefits of the expungement for purposes of recidivist sentencing provisions, at least unless Congress provides otherwise. For as we have recognized, "[s]ociety's stronger interest is in punishing appropriately an unrepentant criminal." *United States v. McDonald*, 991 F.2d 866, 872 (D.C. Cir. 1993).

Consistent with that principle, some federal recidivist provisions expressly exempt expunged or set-aside convictions. For example, the federal Sentencing Guidelines do not count "expunged" convictions for a defendant's criminal history, although the Guidelines do count set-aside convictions. *See* U.S. SENTENCING GUIDELINES MANUAL § 4A1.2(j) (2007); *see also United States v. Fosher*, 124 F.3d 52, 58 (1st Cir. 1997); *Gass v. United States*, 109 F.3d 677, 679-80 (11th Cir. 1997); *United States v. Nicolace*, 90 F.3d 255, 258 (8th Cir. 1996); *United States v. Wacker*, 72 F.3d 1453, 1479 (10th Cir. 1995); *United States v. Levi*, 45 F.3d 453, 457 (D.C. Cir. 1995) (conviction set aside under FYCA was "properly included in determining [defendant's] sentence"); *United States v. Ashburn*, 20 F.3d 1336, 1343 (5th Cir. 1994); *United States v. McDonald*, 991 F.2d at 871-72; *but see United States v. Kammerdiener*, 945 F.2d 300, 301 (9th Cir. 1991).

For purposes of sentences imposed under § 841, however, Congress has not exempted from the "prior convictions" that must be counted those convictions removed from a criminal record for policy reasons unrelated to innocence or an error of law. The courts of appeals that have considered this § 841 question therefore have counted prior felony drug convictions even where those convictions had been set aside, expunged, or otherwise removed from a defendant's record for such reasons. *See, e.g.*, *United States v. Norbury*, 492 F.3d 1012, 1015 (9th Cir. 2007); *United States v. Sampson*, 385 F.3d 183, 194-95 (2d Cir. 2004); *United States v. Graham*, 315 F.3d 777, 783 (7th Cir. 2003); *cf. United States v. Acosta*, 287 F.3d 1034, 1037 (11th Cir. 2002); *United States v. Cisneros*, 112 F.3d 1272, 1281-82 (5th Cir. 1997); *United States v. Meraz*, 998 F.2d 182, 183-88 (3d Cir. 1993); *United States v. Campbell*, 980 F.2d 245, 251 (4th Cir. 1992). We agree with those courts of appeals and reach the same result here.

We now turn to Fletcher's argument that the 1977 conviction was not sufficiently proved. The Government must prove the conviction beyond a reasonable doubt. *See* 21 U.S.C. § 851(c)(1). The Government relied on a docket-sheet entry to prove the 1977 conviction, but Fletcher claims that the docket sheet was insufficient because it lacks "the necessary indicia of reliability." *See United States v. Price*, 409 F.3d 436, 445 (D.C. Cir. 2005). We need not address that contention. Because we are reversing Fletcher's drug-residence conviction, we are already remanding his case for re-sentencing. And the Government has informed the court that, on remand, it will submit a copy of the judgment and order of commitment for Fletcher's 1977 conviction, presumably eliminating any argument about the fact of the conviction. If on remand the Government adequately proves Fletcher's 1977 conviction by producing the judgment and commitment order, the district court must continue to count

the 1977 conviction in determining Fletcher's sentences for Counts 1 and 5.

C.   The Expert Testimony of Detective Thomas

All three defendants contest the admission of Detective Tyrone Thomas's expert testimony about the typical operations of narcotics dealers, arguing that it was testimonial hearsay admitted in violation of the Sixth Amendment as interpreted in *Crawford v. Washington*, 541 U.S. 36 (2004). Because the defendants did not object to Thomas's testimony at trial, we review the admission of the testimony only for plain error. *See* FED. R. CRIM. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731-37 (1993). Defendants have shown no error, much less plain error, because – as we have previously held – *Crawford* does not limit the admissibility of expert witness testimony.

In *Crawford*, the Supreme Court held that the Confrontation Clause of the Sixth Amendment bars the introduction of "testimonial" out-of-court statements by witnesses who are not subject to cross-examination. *See* 541 U.S. at 68-69. The three defendants argue that Detective Thomas formed his opinion about the typical operations of narcotics dealers over the course of thousands of interviews, and that his testimony is in reality the testimony of thousands of out-of-court "witnesses" who were not subject to cross-examination. But as this court has previously explained (in a case involving this same expert), *Crawford* "did not involve expert witness testimony and thus did not alter an expert witness's ability to rely on (without repeating to the jury) otherwise inadmissible evidence in formulating his opinion under Federal Rule of Evidence 703." *United States v. Henry*, 472 F.3d 910, 914 (D.C. Cir. 2007). Here, as in *Henry*, Thomas testified based on his experience as a narcotics investigator; he did not relate statements by out-of-

court declarants to the jury. We therefore find that admission of Thomas's testimony was not error, much less plain error.

D.  The Expert Testimony of Forensic Chemist Waninger

All three defendants contend that the district court erred in denying a motion to strike the expert testimony of Eileen Waninger, an FBI forensic chemist. Waninger testified that evidence recovered from trash cans behind the Rosedale building and from apartments # 3 and # 4 contained residue of controlled substances, including cocaine base, cocaine powder, and heroin. After allowing the prosecution to recall Waninger so she could explain testing procedures in greater detail, the district court denied the objection to her testimony. We review the district court's decision to admit the testimony under an abuse-of-discretion standard. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Defendants argue that the district court should have barred Waninger's testimony because the evidence "did not establish that her conclusions ... were reliable." Under *Daubert*, the district court "must focus 'solely on principles and methodology, not on the conclusions that they generate.'" *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993)). In acting as gatekeeper, the court "must determine first whether the expert's testimony is based on 'scientific knowledge;' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Id.* (quoting *Daubert*, 509 U.S. at 592). As this court noted in *Ambrosini*, the *Daubert* Court outlined four factors that the district court could use to evaluate scientific validity: "(1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the method's known or potential rate of error; and (4) whether the theory or

technique finds general acceptance in the relevant scientific community." *Id.* at 134. The court further emphasized that the inquiry is a flexible one; the factors outlined are not "necessarily applicable in every case or dispositive; nor are [they] exhaustive." *Id.*

Here, Waninger explained that, following FBI Laboratory protocol of identifying residue "by more than one technique," she used at least two of the three following tests to identify the residue on each item: (1) ion mobility spectrometry, (2) infrared spectroscopy, and (3) gas chromatography/mass spectrometry. She testified that ion mobility spectrometry is an accepted "screening technique" in forensic chemistry; that it has been used for "many, many years"; that it is regularly used, including in Drug Enforcement Agency narcotics testing and airport explosives testing; and that a "lot of papers have been written" about its use. She testified that infrared spectroscopy, a technique that passes infrared light through a sample to determine its unique chemical spectra, is used worldwide by forensic chemists to detect controlled substances; that she has used it for ten years; and that it has "been around a lot longer than that." Finally, Waninger testified about the third technique, gas chromatography/mass spectrometry, which allows chemists to "separate the components in a mixture and identify the chemicals in them based upon their mass spectrum." She testified that the technique is "scientifically accepted," that she has used it for more than 15 years, and that it is widely used by forensic chemists for the detection of controlled substances. Waninger also explained that she represents the FBI on a scientific working group for the analysis of seized drugs, and that the group has published recommendations on the minimum standards for qualitative identification of the presence of a controlled substance using those techniques. She further testified that her FBI laboratory followed those standards.

Waninger's testimony that all three techniques have been established for many years, are widely used, and are accepted in the relevant scientific community is sufficient to satisfy the "limited" *Daubert* inquiry. *See Ambrosini*, 101 F.3d at 134 ("General acceptance in the relevant scientific community may be sufficient to permit the admissibility of expert testimony ...."); *see also United States v. Vitek Supply Corp.*, 144 F.3d 476, 485-86 (7th Cir. 1998) (finding that techniques including gas chromatography/mass spectrometry are "widely used and generally accepted in the fields of analytical and forensic chemistry"). We also note the expert's personal experience. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148-49, 151-52 (1999). Waninger had worked at the FBI's Quantico lab for ten years, had previously worked as a forensic scientist for a state police department for four years, and had testified as a forensic chemistry expert at least 40 times "in federal and state courts throughout all of the United States" as well as internationally. The district court did not err in admitting her testimony.

## V. Conclusion

For the reasons stated above, the judgments of the district court are affirmed in part and reversed in part. The cases are remanded to the district court for re-sentencing consistent with this opinion.

*So ordered.*